UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| United States of America, the States of California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Vermont, Virginia, and Washington, the Virgin Islands, Guam, Puerto Rico, and the District of Columbia *ex rel.*, | : : : : : : : : : : : : : : : | Civil Action No.<br><br>FILED IN CAMERA AND UNDER SEAL<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT**<br><br>**JURY TRIAL DEMANDED** |

[Under Seal],

      Plaintiffs,

          v.

[Under Seal],

Defendants.

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| United States of America, the States of California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Vermont, Virginia, and Washington, the Virgin Islands, Guam, Puerto Rico, and the District of Columbia *ex rel.*, | : : : : : : : : : : : : : : : | Civil Action No.<br><br>FILED IN CAMERA AND UNDER SEAL<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT**<br><br>**JURY TRIAL DEMANDED** |
| Willard Pharma LLC, | | |
| Plaintiffs, | | |
| v. | | |
| GlaxoSmithKline plc, GlaxoSmithKline LLC, GlaxoSmithKline Holdings (Americas) Inc., and ViiV Healthcare, | | |
| Defendants. | | |

Willard Pharma LLC brings this *qui tam* action as Relator on behalf of the United States and multiple states and territories against GlaxoSmithKline plc, GlaxoSmithKline LLC, GlaxoSmithKline Holdings (Americas) Inc., and ViiV Healthcare (collectively, GSK), under the federal False Claims Act, 31 U.S.C. §§ 3729-3733, and multiple state and territory False Claims Acts,[1] and makes the following allegations based on personal information and first-hand knowledge.

---

[1] Relator is bringing this action on behalf of and under the False Claims Acts of the following states and the District of Columbia: California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New

## INTRODUCTION

1.      This case is about GSK's improper sale to the government of the HIV drug Cabenuva, which is adulterated, misbranded, and based on an FDA approval secured by fraud.

2.      Cabenuva is a long-acting medication comprised of the two components Cabotegravir Injectable Suspension and Rilpivirine, which are co-administered on a monthly (or bimonthly) basis by intra-muscular injection.  In manufacturing the Cabotegravir Injectable Suspension component, GSK uses a terminal sterilization process that exposes the drug to gamma irradiation to destroy certain potential contaminants before it is injected into the patient. The problem is this irradiation process also causes the chemical breakdown of Cabotegravir Injectable Suspension's two key excipients, polyethylene glycol (PEG) 3350 and polysorbate 20, which in turn leads to the formation of several potentially toxic and/or carcinogenic byproducts that remain undisclosed and uncontrolled in the commercial product GSK sells today.

3.      GSK is well aware the gamma irradiation process it uses in manufacturing Cabotegravir Injectable Suspension causes this excipient breakdown, creating these potentially dangerous chemical byproducts.  Indeed, Relator (through its sole member) was involved in GSK's clinical testing and development of the drug where these results were firmly established. Yet GSK has done nothing to control for this radiation-induced transformation of the drug.  Nor has GSK taken any steps to investigate the potential risks to patients.  In fact, GSK has intentionally avoided fully studying these risks by conducting its FDA-mandated carcinogenicity testing using non-irradiated Cabotegravir.

4.      Nor has GSK disclosed to the FDA, the medical community, or the public more broadly, this product change and the resulting formation of these potential toxins and carcinogens.  GSK not only failed to disclose this information in the New Drug Application

_____

Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Vermont, Virginia, and Washington, as well as the territories of the Virgin Islands, Guam, and Puerto Rico.

(NDA) it filed for Cabenuva's FDA approval.  GSK affirmatively misrepresented there was no excipient breakdown in the product and no meaningful presence of any potentially dangerous chemicals resulting from the manufacturing process.  GSK has taken a similarly false and misleading approach in how it describes Cabenuva in the product label, making no reference to the existence of these impurities and potential toxins and carcinogens resulting from the terminal sterilization of Cabotegravir Injectable Suspension.  In fact, the label affirmatively declares there are none.

5.     The risks from these potential toxins and carcinogens are particularly problematic with this immuno-compromised patient population, most of whom will need HIV treatment for the rest of their lives.  HIV patients are at an already elevated risk of developing certain cancers that may be exacerbated through regular exposure to carcinogens via the Cabenuva treatment regimen, and these carcinogens may also predispose patients to developing additional kinds of cancer.

6.     Furthermore, just weeks ago on December 20, 2021, GSK secured FDA approval for Apretude, a new drug containing the very same Cabotegravir Injectable Suspension used in Cabenuva.  Apretude is meant for use in at-risk adults and adolescents for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually acquired HIV.  Apretude is the first long-acting injectable PrEP option of its kind to receive FDA approval.  This recent development means an even broader population of patients will be exposed to potentially dangerous chemical byproducts introduced in the Cabotegravir Injectable Suspension manufacturing process.

7.     Relator brings this case on behalf of the United States and multiple states and territories to recover the funds paid for these adulterated, misbranded, and fraudulently licensed drugs.  More importantly, Relator brings this case to stop GSK from continuing to sell these potentially dangerous drugs without fully disclosing the risks or taking any steps to control for them.

## PARTIES

8.      Relator Willard Pharma LLC is a limited liability company registered in Delaware.  Through its sole member, Relator was directly involved in the clinical formulation development and analytical testing GSK conducted in support of the FDA's approval of Cabenuva during the time the drug was being studied in late-stage clinical trials.  This testing showed the terminal sterilization process GSK uses in the manufacture of Cabotegravir Injectable Suspension causes PEG 3350 and polysorbate 20 to undergo the significant chemical changes about which Relator complains herein.

9.      Defendant GlaxoSmithKline plc is a public limited company formed and existing under the laws of the United Kingdom, headquartered in London.  It is a multinational pharmaceutical company in the business of researching, developing, and manufacturing prescription medicines, vaccines, and consumer healthcare products.

10.     Defendant GlaxoSmithKline LLC is a Delaware limited liability company headquartered in Philadelphia and North Carolina and a wholly-owned subsidiary of GlaxoSmithKline plc.

11.     Defendant GlaxoSmithKline Holdings (Americas) Inc. is a Delaware corporation with its principal place of business in Delaware.  It is the sole member of Defendant GlaxoSmithKline LLC and a wholly-owned subsidiary of GlaxoSmithKline plc.

12.     Defendant ViiV Healthcare is a Delaware corporation with its principal place of business in North Carolina.  It was created as a joint venture between Defendant GlaxoSmithKline plc and Pfizer Inc. to develop and manufacture HIV infection therapies.  ViiV Healthcare is a subsidiary of GlaxoSmithKline plc., which owns a majority of ViiV Healthcare's shares.  ViiV Healthcare is the entity that secured FDA approval for both Cabenuva and Apretude.  It also is the entity that markets Cabenuva and Apretude and manufactures the Cabotegravir Injectable Suspension component in each.  The Rilpivirine component in

Cabenuva, which is not a subject of this lawsuit, is manufactured by Janssen Sciences Ireland UC (a Johnson & Johnson subsidiary), which is not a defendant herein.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a).

14.     This Court has personal jurisdiction over Defendants under 28 U.S.C. § 1391(b) and 31 U.S.C. § 3732(a) because a substantial part of the events giving rise to this Complaint occurred in this District.  Indeed, GSK's fraud with respect to Cabenuva was originated and continues to be carried out in this District at GSK's facilities in Collegeville and King of Prussia, Pennsylvania.

15.     Pursuant to 31 U.S.C. § 3732(a), venue is proper because Defendants can be found in and transact business within this District.  Throughout the time period relevant to the allegations of this Complaint, Defendants engaged in substantial business transactions within this District and committed many of the violations proscribed by 31 U.S.C. § 3729 in this District.

## FDA DRUG LICENSING AND LABELING REQUIREMENTS

**A.     FDA Licensing Requirements**

16.     Drug manufacturers must obtain FDA approval to sell a new drug in the United States through the NDA licensing process.  21 U.S.C. § 355(a).  All NDAs must include detailed, complete, and accurate information about the drug's composition, manufacturing, and safety.  21 U.S.C. § 355(b); 21 C.F.R. § 314.50.

17.     The "full statement of the composition" of the drug must include complete information relating to both the "drug product" in its final dosage form (such as capsule, tablet, suspension, or solution) and the "drug substance(s)" comprising its active ingredients.  21 U.S.C. § 355(b)(1)(A)(iii); 21 C.F.R. § 314.50(d)(1)(ii)(a); 21 C.F.R. § 314.50.

18.    The NDA's "drug product" section must include significant detail about the drug's makeup, including "[a] list of all components used in the manufacture of the drug product (regardless of whether they appear in the drug product) and a statement of the composition of the drug product; the specifications for each component; . . . a description of the manufacturing and packaging procedures and in-process controls for the drug product; the specifications necessary to ensure the identity, strength, quality, purity, potency, and bioavailability of the drug product, including, for example, tests, analytical procedures, and acceptance criteria relating to sterility, dissolution rate, container closure systems; and stability data with proposed expiration."  21 C.F.R. § 314.50(d)(1)(ii)(a).

19.    The NDA's "drug substance" section must include a similar level of detail covering the drug's active pharmaceutical ingredients, including "[a] full description of the drug substance including its physical and chemical characteristics and stability"; "the method of synthesis (or isolation) and purification of the drug substance"; "the process controls used during manufacture and packaging"; and "the specifications necessary to ensure the identity, strength, quality, and purity of the drug substance and the bioavailability of the drug products made from the substance, including, for example, tests, analytical procedures, and acceptance criteria relating to stability, sterility, particle size, and crystalline form."  21 C.F.R. § 314.50(d)(1)(i).

20.    In addition to this detail about the drug itself, the NDA must also set forth complete information about the drug-making process, including "a full description of the methods used in, and the facilities and controls used for, the manufacture, processing, and packing of such drug."  21 U.S.C. § 355(b)(1)(A)(iv).

21.    The NDA likewise requires detailed, complete, and accurate drug safety information.  This includes a mandatory section on pharmacology and toxicology, covering "[s]tudies of the toxicological effects of the drug as they relate to the drug's intended clinical uses, including, as appropriate, studies assessing the drug's acute, subacute, and chronic toxicity;

carcinogenicity; and studies of toxicities related to the drug's particular mode of administration or conditions of use."  21 C.F.R. § 314.50(d)(2)(ii).

22.    Manufacturers must certify all statements in the NDA are true and agree to comply with all applicable laws and regulations.  Form FDA-356h (Application to Market a New Drug, Biologic, or An Antibiotic Drug For Human Use).

23.    The FDA also provides various forms of guidance on the best practices it expects new drug applicants to follow to ensure their compliance with the FDA's rules and regulations. One major source of this guidance comes from the *ICH Guidelines*, which provide global industry standards for pharmaceutical development, established by the International Council for Harmonisation of Technical Requirements for Pharmaceuticals for Human Use.  *See* FDA, *ICH Guidance Documents* (last updated Mar. 29, 2018), https://www.fda.gov/science-research/clinical-trials-and-human-subject-protection/ich-guidance-documents.

24.    This guidance specifically covers, among other things, disclosing the existence of impurities resulting from drug degradation and byproducts formed during the drug's manufacturing, transportation, and storage.  This includes the degradation of excipients, the drug components that serve as the vehicle or medium for the drug's active substances and which contribute to such product attributes as stability, biopharmaceutical profile, appearance, patient acceptability, and the ease with which the product can be manufactured.

25.    According to the *ICH Guidelines*, new drug applicants should summarize "the degradation products observed during manufacture and/or stability studies" and "any laboratory studies conducted to detect degradation products in the new drug product."  *See* FDA, *ICH Guidelines on Impurities in New Drug Products* (Aug. 2006) at 2, https://www.fda.gov/media/71733/download.  They also should disclose when laboratory testing reveals the presence of degradation products and should report quantitative results numerically, not in general qualitative terms.  *Id.* at 4.  They also should disclose all drug excipients and

"information to support the safety of excipients, when appropriate, should be cross-referenced." FDA, *ICH Guidelines on Pharmaceutical Development* (May 2006) at 4, https://www.fda.gov/media/71524/download.

26.    The *ICH Guidelines* explicitly address mutagens (genotoxins), which are chemicals that can cause cancer by altering DNA structure within human cells.  Known or suspected mutagens, genotoxins, and carcinogens must be disclosed in the NDA and typically controlled much more stringently than other kinds of impurities (i.e., drug-related process impurities and degradation products).  *See* FDA, *ICH Guidelines on Assessment and Control of DNA Reactive (Mutagenic) Impurities in Pharmaceuticals to Limit Potential Carcinogenic Risk* (Mar. 2018) at 6-7, https://www.fda.gov/media/85885/download.

27.    The FDA will refuse to grant an NDA based on false statements or material omissions, or if the manufacturer has not sufficiently demonstrated the drug is safe.  21 U.S.C. § 355(d).  This includes when a drug was not tested "by all methods reasonably applicable to show whether or not such drug is safe for use under the conditions prescribed, recommended, or suggested in the proposed labeling thereof."  21 U.S.C. § 355(d)(1).  It also includes when the "methods used in, and the facilities and controls used for, the manufacture, processing, and packing of such drug are inadequate to preserve its identity, strength, quality, and purity."  21 U.S.C. § 355(d)(3).

28.    The FDA likewise will withdraw its approval for a drug if it subsequently finds the NDA was based on false statements or material omissions, the drug's safety is in question, or the product label contains false statements or material omissions.  21 U.S.C. § 355(e).  This includes when scientific circumstances, or new or additional testing show the drug is unsafe for use.  21 U.S.C. § 355(e)(1)-(2).  It also includes when the agency later finds the NDA "contains any untrue statement of a material fact."  21 U.S.C. § 355(e)(5).

8

29.     After the FDA approves an NDA, manufacturers remain subject to ongoing reporting requirements.  Specifically, they must notify the FDA through an "NDA Field Alert Report" within three working days of learning "[i]nformation concerning any bacteriological contamination, or any significant chemical, physical, or other change or deterioration in the distributed drug product, or any failure of one or more distributed batches of the drug product to meet the specification established for it in the application."  21 C.F.R. § 314.81(b)(1)(ii).

30.     A drug is considered "adulterated" if "it has been prepared, packed, or held under insanitary conditions whereby . . . it may have been rendered injurious to health" or if "the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not . . . assure that such drug . . . has the identity and strength, and meets the quality and purity characteristics, which it purports or is represented to possess."  21 U.S.C. § 351(a)(i). Adulterated drugs cannot legally be sold or distributed.  21 U.S.C. § 331(a).

**B.     FDA Labeling Requirements**

31.     FDA regulations also mandate that prescription drug labeling contain detailed, complete, and accurate information about the drug that is not false or misleading.  21 C.F.R. §§ 201.56(a), 201.56(d), 201.57.  These labeling requirements apply to all written, printed, or graphic material on the drug or its container (such as a vial) or accompanying the drug (such as a package insert).  Complete drug labeling is multifaceted and often contains dozens of pages of text and tables covering a variety of information about the drug product.

32.     Drug labeling must list all active and inactive ingredients with only a few, specifically defined exceptions such as flavorings or color additives.  21 C.F.R. § 201.100(b)(5). The drug label also must include an accurate declaration of the net quantity of all contents of the drug, noted in weight or measure.  21 C.F.R. § 201.51.

33.     The label must also include all indications, effects, dosages, routes, methods, frequency and duration of administration, and any relevant warnings, hazards, contraindications,

side effects, and precautions.  21 C.F.R. § 201.100(d)(1).  Additionally, drugmakers are expressly required to address the drug's carcinogenesis, meaning whether it promotes cancer formation.  21 C.F.R. § 201.56(d)(1).

34.    Among the reasons the FDA may find labeling misleading is any "[f]ailure to reveal the proportion of, or other fact with respect to, an ingredient present in such drug, when such proportion or other fact is material in the light of the representation that such ingredient is present in such drug."  21 C.F.R. § 201.10(c)(2).

35.    Drug manufacturers are responsible for the content of their labeling at all times. They are charged both with crafting adequate and accurate labeling and with ensuring that the information remains adequate and accurate.  A drug is deemed "misbranded" if its labeling is "false or misleading in any particular."  21 U.S.C. § 352(a).  A drug is also considered "misbranded" if it is dangerous to health when used as prescribed.  21 U.S.C. § 352(j). Misbranded drugs cannot legally be sold or distributed.  21 U.S.C. § 331(a).

*  *  *

36.    The information drug manufacturers provide in NDAs, on product labels, and with respect to their continuing duty to report issues relating to product safety and integrity, is critical to the FDA's decision-making in approving the licensing and continued sale of drugs in this country.  This information also is central to whether, independent of FDA decision-making, the manufacturer is permitted to sell the product at all.

## CABENUVA'S LICENSING AND LABELING

37.    Cabenuva is the brand name for an injectable medication the FDA approved for use in the United States in January 2021 to treat HIV/AIDS.  It comes co-packaged as two separate vials.  One contains Cabotegravir Injectable Suspension, manufactured by GSK and the subject of the fraud Relator challenges here.  The other contains Rilpivirine, manufactured separately by non-party Janssen Sciences and not the subject of Relator's allegations here.

Together, the two drugs comprise Cabenuva, a complete HIV treatment regimen.  Cabenuva also is approved for use in Canada and the European Union.

38.    Up until now, the standard of care for HIV patients has been to take a daily supply of pills.  Cabenuva, however, is administered only once a month, and was just approved for use every two months, dramatically easing the treatment course HIV patients must follow. Cabenuva's monthly and now bimonthly protocol is possible because the combination drug is long acting, meaning it slowly releases over time to maintain a consistent level of medicine in the body between injections.

39.    Cabenuva's long-acting therapy also is expected to contribute to increased adherence rates, which is the degree to which patients comply with their treatment regimen.  The need for strong adherence is especially strong in the HIV context because of the high risk of virus transmission from HIV-infected individuals who do not maintain suppressed viral loads through medication.  Strong adherence has been a particular challenge with the existing daily HIV therapies, especially among the infected populations comprised of drug users, sex workers, and those in prison.

40.    With its novel approach to treating HIV, GSK expects Cabenuva to quickly eclipse the more traditional treatment protocols, projecting roughly $2 billion in global sales over the next decade.

41.    GSK (through ViiV Healthcare) filed its NDA for Cabenuva on April 29, 2019.  It also filed an NDA for Vocabria, which is Cabotegravir in tablet form.  The other Cabenuva component Rilpivirine has been approved to treat certain HIV-positive individuals for more than a decade.

42.    On January 21, 2021, the FDA approved the NDA for Cabenuva as a monthly treatment for HIV-1 infection in virologically suppressed adults on a stable regimen, with no history of treatment failure, and with no known or suspected resistance to either of the two

component drugs, Cabotegravir Injectable Suspension and Rilpivirine.  The FDA also approved Vocabria, which is Cabotegravir in the form of 30 mg tablets to be taken in combination with oral Rilpivirine (Edurant) for one month prior to starting treatment with Cabenuva to ensure the medications are well-tolerated before switching to the extended-release injectable formulation.

43.     In its statements announcing Cabenuva's approval, GSK lauded the drug as "an innovation we have been waiting for," calling it "truly remarkable" and the "first of its kind." *See* Press Release, ViiV Healthcare, "ViiV Healthcare Announces FDA Approval of Cabenuva (Cabotegravir, Rilpivirine), the First and Only Complete Long-Acting Regimen for HIV Treatment" (Jan. 21, 2021), https://viivhealthcare.com/hiv-news-and-media/news/press-releases/2021/january/viiv-healthcare-announces-fda-approval-of-cabenuva/.  The company's press release also disclosed warnings and precautions, including hypersensitivity reactions, hepatotoxicity, depressive disorders, and possible risks associated with drug interactions.  The Cabenuva.com website highlights similar information but in further detail, both promoting the treatment's advantages and warning of certain possible side effects and risks.

44.     On February 24, 2021, GSK filed a supplemental NDA for the expanded use of Cabenuva, extending the necessary dosing from monthly injections to injections every two months.  On February 1, 2022, ViiV Healthcare announced the FDA approved the application. *See* Press Release, ViiV Healthcare, "ViiV Healthcare Announces US FDA Approval of Cabenuva (Cabotegravir, Rilpivirine), for Use Every Two Months, Expanding the Label of the First and Only Complete Long-Acting HIV Treatment" (Feb. 1, 2022), https://viivhealthcare.com/en-us/media-center/news/press-releases/2022/january/viiv-healthcare-announces-us-fda-approval-of-cabenuva/.

45.     Cabenuva's product label is comprised of several parts, the most detailed of which is the portion on "Full Prescribing Information" which, among other things, describes the drug's Indications and Usage, Dosage and Administration, Warnings and Precautions, Adverse

Reactions, Description, Clinical Pharmacology, and Nonclinical Toxicology.  *See* FDA,

Highlights of Prescribing Information for Cabenuva (Jan. 2021),

https://www.accessdata.fda.gov/drugsatfda_docs/label/2021/212888s000lbl.pdf.

**CABOTEGRAVIR INJECTABLE SUSPENSION'S CHEMICAL
BREAKDOWN FROM GAMMA IRRADIATION**

46.      To ensure patient safety, injectable drug products must be completely sterile at the

time of injection to prevent potential microbial contaminants such as yeasts, molds, or bacteria

from entering the body.  This can be accomplished by using a sterile facility to manufacture the

drug, which is what Janssen does in manufacturing Rilpivirine.  It also can be accomplished

through a variety of terminal sterilization techniques, which drug manufacturers apply after the

drug is packaged (filled into a vial or otherwise) for ultimate delivery to the patient.

47.      To avoid the significant cost of building a sterile manufacturing facility for

Cabotegravir Injectable Suspension, GSK instead considered a variety of terminal sterilization

techniques, eventually settling on subjecting the final packaged product to gamma irradiation.

On top of the cost savings, GSK discovered an additional and unintended benefit of terminal

sterilization through gamma irradiation is an extended product shelf life because the gamma

irradiated drug particles of Cabotegravir Injectable Suspension grow much slower than non-

irradiated particles of the same formulation.

48.      GSK did not observe this beneficial effect with any other kind of terminal

sterilization process it evaluated during the product's development.  The problem is that in

causing this radiation-induced chemical reaction that extends the product shelf life, the gamma

irradiation also causes two of Cabotegravir Injectable Suspension's key excipients -- PEG 3350

and polysorbate 20 -- to decompose in an uncontrolled manner into various chemical byproducts.

49.      GSK is well aware of the significant chemical degradation of PEG 3350 and

polysorbate 20 following irradiation of Cabotegravir Injectable Suspension.  It was evident from

13

the size-exclusion chromatograms the company collected comparing both pre- and post-irradiation samples of the product, and which showed dramatic changes in the chemical composition of the two excipients. GSK further corroborated these changes through additional analytical testing (e.g., liquid chromatography-mass spectrometry, particle size distribution, and scanning electron microscopy measurements).

50.     For example, a November 2020 internal GSK presentation reporting on this testing concluded that "[g]amma-irradiation degraded and crosslinked PEG3350 and Polysorbate20," and that "6 months at 40ºC did not degrade the vehicle nearly as much as the degradation induced by gamma-irradiation." This same presentation acknowledged that "excipient stability is just as important as API [active pharmaceutical ingredient] stability."

51.     A March 2018 internal GSK memo likewise reported that "[t]he main conclusion is that gamma-irradiation significantly changes the molecular weight distributions and/or species of PEG3350 and Polysorbate20, which in turn prevents instability, agglomeration and/or sedimentation." The memo similarly noted the company's "hypothesis [] that the excipients stabilizing and suspending [Cabotegravir] particles broke down and/or increased in particle size due to radiation-induced breaking and re-crosslinking."

52.     A 2017 internal GSK memo similarly reported on the significant chemical changes to PEG 3350 and polysorbate 20 caused by subjecting Cabotegravir Injectable Suspension to gamma irradiation, finding: (i) "a clear particle size distinction between non-irradiated and irradiated suspensions," (ii) "Gamma-irradiation of the samples changed the molecular weight distributions of the polysorbate 20 and PEG3350 and is likely impacting the particle size stability of the irradiated batches," (iii) "Gamma irradiation results in polymer chain degradation," and (iv) "Higher irradiation doses lead to greater extent of polymer chain degradation compared to lower irradiation doses."

53.     GSK also is well aware that the degradation of PEG 3350 and polysorbate 20 from gamma irradiation forms various chemical byproducts.  A 2015 internal GSK memo, for example, specifically recognized that the pH drop measured following the irradiation of Cabotegravir Injectable Suspension is due to the formation of acids inside the vials, through the gamma irradiation process, consistent with published works by Kerwin, 2007 and Kishore, 2011 as well as Bhalla, 1983.

54.     The three papers this internal memo referenced are (i) *Polysorbates 20 and 80 Used in the Formulation of Protein Biotherapeutics: Structure and Degradation Pathways*, by Bruce A. Kerwin; (ii) *The Degradation of Polysorbates 20 and 80 and its Potential Impact on the Stability of Biotherapeutics*, by Ravuri S. K. Kishore *et al*.; and (iii) *Radiation Sterilization of Polyethylene Glycols*, by H.L. Bhalla *et al*.  All of them identify peroxides, acids, aldehydes, ketones and a host of other impurities that can result from exposing a drug like Cabotegravir Injectable Suspension to gamma irradiation.[2]

55.     Citing to these sources, GSK highlighted the various chemical byproducts that can result from irradiating PEG 3350 and polysorbate 20.  Citing Kerwin and Kishore, for example, the 2015 memo provides: "Polysorbate 20 and 80 undergoes auto-oxidation resulting in hydroperoxide formation, side-chain cleavage and eventually formation of acids, peroxides, aldehydes, ketones, and fatty acid esters.  Formation of acid will result into [sic] drop in pH of formulation."  Citing Bhalla, the memo provides: "[PEG 3350] undergoes oxidation to form peroxides which are unstable and decompose over time to produce aldehyde species, typically acetaldehyde."

---

[2]  *See, e.g.*, Kerwin, 97 J. OF PHARM. SCI. 2932 (2007) ("[D]egradation [of polysorbates 20 and 80 in drug products] can occur under a variety of conditions leading to formation of acids and peroxides that can readily degrade proteins."); *id*. at 2931 ("Low concentrations of formaldehyde have also been identified as contaminants in polysorbate solutions . . . ."); Kishore, 28 PHARM. RES. 1194 (2011) ("The degradation of polysorbate leads to a buildup of various molecules, some of which are poorly soluble, including fatty acids and polyoxyethylene (POE) esters of fatty acids."); Bhalla, 17 INT'L J. OF PHARM. 353 (1983) (finding PEGs exposed to gamma irradiation "showed marked changes [in] peroxide content, pH and ethylene oxide content").

56.     The 2017 memo presented similar findings and a similar recognition at GSK that subjecting Cabotegravir Injectable Suspension to gamma irradiation decomposes PEG 3350 and polysorbate 20 into various chemical impurities, the concentration of which depends on both the radiation dose and the amount of headspace oxygen in the particular vial:

- "[PEG 3350] undergoes oxidation to form peroxides which are unstable and decompose over time to produce aldehyde species, typically acetaldehyde."

- "What is the impact of gamma irradiation on cabotegravir suspension? . . . Potential for both steric and surface modification effects."

- "For PEG3350, there was an extreme shift to lower molecular weights post irradiation."

- "There is a clear shift to lower PEG molecular weights which can be derived from both PEG3350 and polysorbate 20 degradation. This is important to note as both PEG3350 and polysorbate 20 contribute to the shifts observed post-irradiation . . . ."

- "As was previously shown . . . , when PEG3350 is irradiated it fragments into smaller chain lengths."

- "Polysorbate 20 undergoes auto-oxidation resulting in hydroperoxide formation, side-chain cleavage and eventually formation of acids, peroxides, aldehydes, ketones and fatty acid esters. Formation of acid will result in drop in pH of formulation (Kerwin 2007, Kishore 2011)."

57.     It is well recognized that some of these chemical byproducts formed by the breakdown of PEG 3350 and polysorbate 20 are known carcinogens that must be carefully controlled to minimize the risk to patients of developing cancer over their lifetime.

58.     For example, aldehydes are a class of molecules known to be carcinogenic in some instances. Formaldehyde in particular is a well-known environmental risk factor for leukemia and cancers of the nose, throat, and sinuses, as reflected in decades of research. *See, e.g.,* J. A. Swenberg *et al.*, *Formaldehyde Carcinogenicity Research: 30 Years and Counting for*

*Mode of Action, Epidemiology, and Cancer Risk Assessment*, 41 TOXICOL. PATHOL. 181 (2013). Various authoritative organizations recognize formaldehyde as a human carcinogen, including the World Health Organization, the International Agency for Research on Cancer ("IARC"), and the National Cancer Institute (a part of the U.S. Department of Health and Human Services). Accordingly, federal agencies like the FDA and the EPA, as well as various states, set limits on the use of formaldehyde in the products they regulate.

59.     Moreover, formaldehyde's carcinogenesis has only been well studied as an environmental toxin.  Formaldehyde exposure through intramuscular injection, as in the case of Cabotegravir Injectable Suspension, has not been studied, and could lead to new cancers beyond those already associated with formaldehyde exposure.  Moreover, intramuscular injections insert the drug in a highly focused region of the body, meaning any safe daily exposure limit for formaldehyde administered this way may be significantly lower than for either oral or inhalation routes.

60.     Acetaldehyde is also recognized as a carcinogen, including by IARC, and has been linked to cancer via indirect exposure (such as through alcohol consumption) in sufficient quantities.  As with formaldehyde, direct exposure to acetaldehyde via intramuscular injection might exacerbate this known risk and given its lack of study, could lead to cancers beyond those already associated with acetaldehyde exposure.

61.     GSK's 2017 technical memorandum acknowledging that gamma irradiation decomposes PEG 3350 and polysorbate 20 into various chemical impurities makes clear the company specifically knew that aldehydes were among the degradation products.  That memo laid out the key hypothesis for how gamma irradiation effectively staves off the growth of the drug particles in Cabotegravir Injectable Suspension during storage: "Assuming aldehydes and carboxylic oligomers as the main PEG degradation products, these could interfere with the growth upon ripening of the particles along the {1 0 1} [crystal] faces."

62.     Despite GSK's knowledge of the presence of potential toxins and carcinogens in the drug it is selling to chronically treat HIV patients, GSK has done nothing to share this information with the FDA, the broader medical community, or the public at large.  GSK failed to disclose this information in its NDA for original FDA approval, in the supplemental NDA it recently filed to extend the dosing to an every-two-month regime, in the product label, in any subsequent communications with the FDA, or in any other public statements about what GSK is marketing as a breakthrough treatment for HIV.

63.     At the same time, GSK has taken no steps to control for these potential toxins and carcinogens or conducted any testing to assess the actual risks these potential toxins and carcinogens pose to the immuno-suppressed population of patients who will be taking this drug over a course of years, and for most of them, the rest of their lives.

## GSK'S FRAUD IN ITS CABENUVA LICENSING, LABELING, AND CONTINUED SALE

64.     GSK knows the terminal sterilization process it uses on Cabotegravir Injectable Suspension adulterates the product by degrading the two excipients PEG 3350 and polysorbate 20.  GSK further knows this degradation results in chemical byproducts such as aldehydes, peroxides, acids, ketones, and other impurities that can be toxic or even carcinogenic, a risk particularly pronounced with this immuno-compromised patient population.  Yet, GSK has not disclosed to the FDA or the public, either in its Cabenuva NDA or labeling, anything about this product degradation and the long-term risks it poses to patients.

65.     In the Cabenuva NDA, for example, the "Description and Composition" section of the application (3.2.P.1) described only the pre-irradiated drug product composition rather than the post-irradiated product composition that is administered to patients.  It therefore did not identify any of the chemical byproducts from the irradiated-induced breakdown of PEG 3350 and polysorbate 20, all of which should have been listed either as excipients in the NDA and on

the Cabenuva label, or as impurities, in which case they should have been disclosed in the NDA and appropriately controlled per ICH guidelines.

66.    The "Excipient Selection" section (m2.3.P Quality Overall Summary) was equally silent on the significant degradation at issue, claiming "no excipient attributes were identified with a high potential to impact product quality . . . ."  GSK further misrepresented that ". . . no additional controls beyond those listed in the pharmacopoeia are required," indicating that the Generally Regarded as Safe (GRAS) excipients listed in the Cabotegravir Injectable Suspension remain intact during manufacturing.  As GSK was fully aware, the terminal sterilization process decomposes the two key excipients PEG 3350 and polysorbate 20 to the point where they cannot be considered GRAS because their purity has been altered.  Even in the "Characterization of Impurities" section (3.2.P.5.5), GSK falsely stated: "No degradation products specific to the drug product have been identified," which is directly contradicted by the many internal GSK memos that acknowledged the exact opposite.

67.    In the "Pharmaceutical Development" section (P.2.3, subsection 5.6.3.3), GSK likewise falsely represented the "chemical and physical stability" of Cabotegravir Injectable Suspension, stating: "No significant changes were observed in description, content, drug-related impurities, particle size, pH, or sold-state form, and all results complied with specification in place at time of testing."  While GSK (at subsection 5.5.2.5) did note the connection between irradiation and lowering of pH, GSK did not disclose that the drop reflected impurities created from the degradation of PEG 3350 and polysorboate 20, nor did it disclose what those potentially serious impurities were.

68.    In Section 3.2.P.2.2, GSK presented a very limited data set purporting to quantify formaldehyde and total peroxide formation, and falsely claimed this ". . . verifies the negligible impact of gamma irradiation on these excipients . . . ."  This "disclosure" served as a false assurance about the drug's safety.  GSK did not actually "verif[y] the negligible impact of

gamma irradiation on these excipients." Nor has the company taken the necessary steps to control for the chemical byproducts it knows flow from the degradation of Cabotegravir Injectable Suspension. Additionally, the data GSK cites to came from a small-scale study performed early in the drug development process and is not representative of the commercial scale manufacturing process GSK actually uses to make the product. It did not cover any other potentially harmful byproducts of the gamma irradiation process either. Indeed, the NDA entirely omits any mention of these other potential toxins and carcinogens.

69. Upon information and belief, GSK also failed to disclose and affirmatively misrepresented in its supplemental NDA (extending Cabenuva dosing from monthly injections to injections every two months) the Cabotegravir excipient degradation and the long-term risks it poses to patients.

70. The Cabenuva label is equally false and misleading in failing to disclose the chemical breakdown of PEG 3350 and polysorbate 20 from the gamma irradiation and the resulting product composition, including known toxins and carcinogens present in the product injected into patients.

71. For example, under the Description section on page 17, the label states that for Cabotegravir Injectable Suspension, "[e]ach sterile single-dose vial contains . . . the following inactive ingredients: mannitol (35 mg/mL), polyethylene glycol (PEG) 3350 (20 mg/mL), polysorbate 20 (20 mg/mL), and Water for Injection." These excipients also are identified as Cabotegravir Injectable Suspension's inactive ingredients on page 38 under Patient Information. There is no other reference to these excipients or any other Cabotegravir Injectable Suspension inactive ingredients in the product label. More specifically, there is no reference to any of the chemicals formed as byproducts from the decomposition of PEG 3350 and polysorbate 20 resulting from the gamma irradiation terminal sterilization process.

72.     Similarly, under the Nonclinical Toxicology section on page 29, the label states that two-year carcinogenicity studies of Cabotegravir in mice and rats showed "no drug-related increases in tumor incidence" at Cabotegravir exposures significantly higher than in humans. The label further provides that Cabotegravir was "not genotoxic," in the various assays GSK performed, meaning it did not result in cellular damage causing mutations or potentially cancer. However, these findings only pertain to the active pharmaceutical ingredient in the drug and not the terminally sterilized form of the drug product that is actually administered to patients by injection.  Indeed, the referenced carcinogenic study was done with Cabotegravir dosed orally, not by injection as it is actually administered to patients with the Cabenuva product.  *See* European Medicines Agency, *Vocabria Assessment Report* (Oct. 15, 2020) at 33-34 https://www.ema.europa.eu/en/documents/assessment-report/vocabria-epar-public-assessment-report_en.pdf.  *See also* FDA, *ICH Guidance on Toxicokinetics* (Mar. 1995) at 10-11, https://www.fda.gov/media/71990/download (stating that with respect to carcinogenicity (oncogenicity) studies, "[p]articular attention should be paid . . . to the use of routes or methods of administration which are being used for the first time.").

73.     Additionally, under the Warnings and Precautions section on pages 5-7, the label identifies the potential for hypersensitivity reactions, post-injection reactions, hepatoxicity, depressive disorders, and adverse reactions or loss of virologic response from the concomitant use of Cabenuva with other drugs.  However, there is no reference here, or anywhere else in the label, to any carcinogenicity risks or concerns.

74.     GSK similarly fails to disclose the presence of potential toxins or carcinogens in GSK's various public-facing statements on Cabenuva, including the press release announcing Cabenuva's approval and on GSK's website.  Like with the label, GSK's failure here is especially misleading given GSK's disclosure of other warnings and precautions, including the risk from Cabenuva of side effects, adverse reactions, and developing other serious conditions.

## GSK'S FRAUD EXTENDS TO NEWLY APPROVED APRETUDE

75.    On December 20, 2021, GSK obtained FDA approval to sell a drug branded as Apretude, which solely consists of Cabotegravir Injectable Suspension.  Unlike Cabenuva, which is approved to treat HIV-positive individuals, Apretude is approved for HIV pre-exposure prevention to reduce the risk of sexually acquired HIV in at-risk adults and adolescents.

76.    Upon information and belief, GSK uses the same gamma irradiation terminal sterilization technique in manufacturing Apretude as it does in manufacturing the Cabotegravir Injectable Suspension component of Cabenuva.  This necessarily results in the same degradation of PEG 3350 and polysorbate 20 and the same formation of potential toxins and carcinogens. Relator knows this because the vials that contain Apretude and Cabenuva's Cabotegravir Injectable Suspension component both share the same brownish color, a clear indication each drug is subjected to gamma irradiation.  Additionally, it is implausible that GSK developed an entirely distinct process to sterilize the same drug substance, especially given the short amount of time between the FDA's approval of the two drugs.

77.    Like the Cabenuva label, the Apretude label is false and misleading because it similarly fails to disclose the chemical breakdown of PEG 3350 and polysorbate 20 and the resulting formation of potential toxins and carcinogens.

78.    For example, in the Desciption section at page 19, the label states that Apretude "contains cabotegravir extended-release injectable suspension" and that "[e]ach vial delivers 600 mg/3 mL (200 mg/mL) of cabotegravir and mannitol (105 mg), polyethylene glycol (PEG) 3350 (60 mg), polysorbate 20 (60 mg), and Water for Injection."  Page 39 under Patient Information repeats these ingredients and identifies Cabotegravir as the only active ingredient.  There is no other reference to the remaining ingredients or any other Cabotegravir Injectable Suspension inactive ingredients in the product label.  More specifically, there is no reference to any of the chemicals formed as byproducts from the decomposition of PEG 3350 and polysorbate 20

resulting from the gamma irradiation terminal sterilization process.

79.     Similarly, the Nonclinical Toxicology section on page 26 repeats the conclusions in the corresponding section of the Cabenuva label, including that Apretude is not genotoxic and did not cause tumor incidence in studies conducted on mice and rats.  As explained above, little is known about the acceptable limits of intramuscularly-injected aldehydes and other potential toxins and carcinogens introduced during gamma irradiation and there is no reference here, or anywhere else in the label, to any carcinogenicity risks or concerns.

80.     Additionally, the Warnings and Precautions section on page 6 of the label identifies similar risks as those disclosed on the Cabenuva label but likewise fails to reference any carcinogenicity risks or concerns.

81.     Upon information and belief, GSK also failed to disclose and affirmatively misrepresented in its Apretude NDA the irradiation-induced breakdown of PEG 3350 and polysorbate 20 and the resulting formation of potential toxins and carcinogens.

82.     GSK's failure to disclose these risks is particularly concerning because GSK expects this drug to reach an even broader patient population than Cabenuva and there is already a considerable market for PrEP HIV drugs.  PrEP for HIV is currently recommended for 1.2 million Americans.  In the first nine months of 2021, the two primary drugs that Apretude will compete with, Truvada and Descovy, generated roughly $3 billion in sales in the United States.  Apretude holds significant promise to largely replace these drugs, which require a daily pill, because it is the first available long-acting injectable PrEP option for HIV.

### GSK'S HARM TO GOVERNMENT PURCHASERS OF CABENUVA

83.     While GSK has been selling Cabenuva in the U.S. only since February 2021, GSK already has made roughly $22 million in U.S. sales, a number that is exponentially growing with GSK's heavy advertising push and the novel approach the drug presents for treating HIV.  The majority of these sales have been, and will continue to be, to the government through the

various federal and state-funded healthcare programs including Medicare, Medicaid, TRICARE, and various government direct pay programs.

84.    These same federal and state-funded healthcare programs generally cover the cost of PrEP drugs like Truvada and Descovy, meaning they will also soon cover Apretude given its recent FDA approval.  Government payers are likely to quickly expend significant dollars on Apretude due to the size of the PrEP HIV market and the benefits in administration Apretude provides over the existing alternatives on the market.

85.    Medicare is a federally funded health insurance program that provides certain healthcare benefits for persons who are over 65, disabled, or suffer from End Stage Renal Disease.  The Medicare program is administered by the Centers for Medicare and Medicaid Services (CMS), part of the Department of Health and Human Services.

86.    CMS relies on the FDA's drug approval determinations when it decides whether to make a drug eligible for payment under the Medicare program.  With limited exceptions not applicable here, CMS will only pay for FDA-approved drugs.  *See* Medicare Program: Revised Process for Making Medicare National Coverage Determinations, 68 Fed. Reg. 55634, 55636 (Sept. 26, 2003) ("Because the FDA is charged with regulating whether devices or pharmaceuticals are safe and effective for use by consumers, generally we will not accept a request for a device or pharmaceutical that has not been approved or cleared for marketing by the FDA for at least one indication.").

87.    This ineligibility for reimbursement extends to FDA approvals secured by fraud. *See, e.g., United States ex rel. Campie v. Gilead Sciences Inc*., 862 F.3d 890, 903-04 (9th Cir. 2017) (finding drugs may be ineligible for CMS reimbursement when FDA approval is based on false statements).

88.     Medicare also will not cover adulterated or misbranded drugs.  Regardless of what FDA approvals have been granted, adulterated or misbranded products may not be sold, distributed, or purchased in the U.S.

89.     Medicaid is a public assistance program that provides certain healthcare benefits for low-income and disabled patients.  Medicaid is jointly funded by the United States and states participating in the program.  Like Medicare, Medicaid will only pay for FDA-approved drugs. *See* 42 U.S.C. § 1396r-8(k)(2) ("covered outpatient drug[s]" limited to those approved by the FDA).

90.     TRICARE (formerly known as CHAMPUS) is the Department of Defense health insurance program for active military personnel, military retirees, and their dependents.  Like Medicare and Medicaid, FDA approval is a prerequisite for drug reimbursement under the TRICARE Program.  32 C.F.R. § 199.  *See also* TRICARE, *Pharmacy Program Handbook* (Jan. 2021) at 11, https://tricare.mil/~/media/files/tricare/publications/handbooks/pharmacy_hbk.pdf ("The TRICARE Pharmacy Program provides outpatient coverage to beneficiaries for medications that are approved for marketing by the [FDA] and that generally require prescriptions."); TRICARE, "How Drugs Become Covered by TRICARE" (last updated Mar. 22, 2019), https://www.tricare.mil/CoveredServices/HowBenefitBecomesCovered/DetailedStepsDrugs ("Before TRICARE can cover a drug, the [FDA] has to approve it.").

91.     In addition to covering prescription drug costs for publicly insured beneficiaries, the United States directly purchases millions of doses of prescription drugs, including HIV drugs, annually through the Department of Defense, the Department of Veterans Affairs, the Federal Bureau of Prisons, the Public Health Service, and the United States Agency for International Development's (USAID) President's Emergency Plan for AIDs Relief Program (PEPFAR).  Generally, under all these programs, FDA approval is a prerequisite for payment.

*See e.g.,* 48 C.F.R. § 46.408 (assigning Government contract quality assurance regarding prescription drugs to the FDA).

92.     In failing to disclose the full chemical composition of Cabotegravir Injectable Suspension that is administered to patients -- including the potentially toxic and carcinogenic chemical byproducts resulting from the degradation of PEG 3350 and polysorbate 20 following gamma irradiation -- GSK has harmed the government through its sale of a product the government would not, and could not, otherwise have purchased.

93.     The government would not have purchased Cabenuva had it known GSK secured FDA approval for the product based on fraud.  Nor would the government have purchased the product had it known GSK has taken no steps to control for the potential risks associated with the chemical degradation of PEG 3350 and polysorbate 20 from gamma irradiation, or to even assess how serious those risks are.

94.     The government also would not have purchased Cabenuva if the FDA had not approved the drug, which the agency surely would not have had it known about these undisclosed, potentially toxic and carcinogenic impurities which GSK has taken no steps to control or assess.

95.     Likewise, the government could not have purchased Cabenuva based on the presence of these undisclosed, potentially toxic and carcinogenic impurities, which render the drug adulterated and misbranded and barred from being purchased or sold under any circumstances.

96.     The government will be harmed in the same way from its imminent purchases of Apretude, which will grow exponentially if the government does not take quick action to stop the fraud alleged herein.

## CLAIMS FOR RELIEF

### COUNT I
### Federal False Claims Act
### 31 U.S.C. § 3729(a)(1)(A), (B)

97.     Relator realleges and incorporates by reference all the allegations set forth herein.

98.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729 *et seq.*, as amended.

99.     As set forth above, in violation of 31 U.S.C. § 3729(a)(1)(A), GSK knowingly presented, or caused to be presented, to the United States government, false or fraudulent claims for payment or approval when it billed the government for Cabenuva (and Apretude), a drug which is adulterated, misbranded, and based on an FDA approval secured by fraud.  It also is a product the government would never have purchased had it known GSK has taken no steps to control or assess the risk of potentially toxic and carcinogenic impurities.  Indeed, it is a drug the government could not have purchased because of its adulterated and misbranded nature.

100.    As set forth above, in violation of 31 U.S.C. § 3729(a)(1)(B), GSK also knowingly made, used, or caused to be made or used, false records and statements to obtain payment or approval by the government of GSK's false or fraudulent claims.  These include the Cabenuva NDA, supplemental NDA, and label, all of which fail to disclose the presence of these byproducts and the safety risks they pose, and affirmatively misrepresent there are no such impurities or safety risks.  The same is true for Apretude.

101.    These false claims, statements, and records were material to the government's purchases of and payments for Cabenuva (and soon for Apretude).  In fact, had the government known of GSK's fraud with respect to Cabenuva (and Apretude), it would not and could not have purchased the product at all.

102.    To the extent the facts alleged in this Complaint have been previously disclosed to the public or the government in any fashion, Relator is an "original source" of the information as defined in 31 U.S.C. § 3730(e)(4).

103.    The United States government, the public, and the public treasury have been damaged by and continue to be damaged by GSK's fraudulent conduct.

**COUNT II**
**California False Claims Act**
**Cal. Gov't Code § 12650 *et seq*.**

104.    Relator realleges and incorporates by reference all the allegations set forth herein.

105.    This is a claim for treble damages and penalties under the California False Claims Act, Cal. Gov't Code § 12650 *et seq*.

106.    As set forth above, in violation of Cal. Gov't Code § 12651(a)(1), GSK knowingly presented, or caused to be presented, to California, false or fraudulent claims for payment or approval when it billed the government for Cabenuva (and Apretude), a drug which is adulterated, misbranded, and based on an FDA approval secured by fraud.  It also is a product the government would never have purchased had it known GSK has taken no steps to control or assess the risk of potentially toxic and carcinogenic impurities.  Indeed, it is a drug government could not have purchased because of its adulterated and misbranded nature.

107.    As set forth above, in violation of Cal. Gov't Code § 12651(a)(2), GSK also knowingly made, used, or caused to be made or used, false records and statements to obtain payment or approval by the government of GSK's false or fraudulent claims.  These include the Cabenuva NDA, supplemental NDA, and label, all of which fail to disclose the presence of these impurities and the safety risks they pose, and affirmatively misrepresent there are no such impurities or safety risks.  The same is true for Apretude.

108.    These false claims, statements, and records were material to the government's purchases of and payments for Cabenuva (and soon for Apretude).  In fact, had the government

known of GSK's fraud with respect to Cabenuva (and Apretude), it would not and could not have purchased the product at all.

109.    To the extent the facts alleged in this Complaint have been previously disclosed to the public or the government in any fashion, Relator is an "original source" of the information as defined in Cal. Gov't Code § 12652(d)(3).

110.    California, the public, and the public treasury have been damaged by and continue to be damaged by GSK's fraudulent conduct.

**COUNT III**
**Colorado Medicaid False Claims Act**
**Colo. Rev. Stat. § 25.5-4-304 *et seq*.**

111.    Relator realleges and incorporates by reference all the allegations set forth herein.

112.    This is a claim for treble damages and penalties under the Colorado Medicaid False Claims Act, Colo. Rev. Stat. § 25.5-4-304 *et seq*.

113.    As set forth above, in violation of Colo. Rev. Stat. § 25.5-4-305(1)(a), GSK knowingly presented, or caused to be presented, to Colorado, false or fraudulent claims for payment or approval when it billed the government for Cabenuva (and Apretude), a drug which is adulterated, misbranded, and based on an FDA approval secured by fraud.  It also is a product the government would never have purchased had it known GSK has taken no steps to control or assess the risk of potentially toxic and carcinogenic impurities.  Indeed, it is a drug the government could not have purchased because of its adulterated and misbranded nature.

114.    As set forth above, in violation of Colo. Rev. Stat. § 25.5-4-305(1)(b), GSK also knowingly made, used, or caused to be made or used, false records and statements to obtain payment or approval by the government of GSK's false or fraudulent claims.  These include the Cabenuva NDA, supplemental NDA, and label, all of which fail to disclose the presence of these impurities and the safety risks they pose, and affirmatively misrepresent there are no such impurities or safety risks.  The same is true for Apretude.

29

115.    These false claims, statements, and records were material to the government's purchases of and payments for Cabenuva (and soon for Apretude).  In fact, had the government known of GSK's fraud with respect to Cabenuva (and Apretude), it would not and could not have purchased the product at all.

116.    To the extent the facts alleged in this Complaint have been previously disclosed to the public or the government in any fashion, Relator is an "original source" of the information as defined in Colo. Rev. Stat. § 25.5-4-306(5).

117.    Colorado, the public, and the public treasury have been damaged by and continue to be damaged by GSK's fraudulent conduct.

## COUNT IV
## Connecticut False Claims Act
## Conn. Gen. Stat. § 4-275 *et seq.*

118.    Relator realleges and incorporates by reference all the allegations set forth herein.

119.    This is a claim for treble damages and penalties under the Connecticut False Claims Act, Conn. Gen. Stat. § 4-275 *et seq.*

120.    As set forth above, in violation of Conn. Gen. Stat. § 4-275(a)(1), GSK knowingly presented, or caused to be presented, to Connecticut, false or fraudulent claims for payment or approval when it billed the government for Cabenuva (and Apretude), a drug which is adulterated, misbranded, and based on an FDA approval secured by fraud.  It also is a product the government would never have purchased had it known GSK has taken no steps to control or assess the risk of potentially toxic and carcinogenic impurities.  Indeed, it is a drug the government could not have purchased because of its adulterated and misbranded nature.

121.    As set forth above, in violation of Conn. Gen. Stat. § 4-275(a)(2), GSK also knowingly made, used, or caused to be made or used, false records and statements to obtain payment or approval by the government of GSK's false or fraudulent claims.  These include the Cabenuva NDA, supplemental NDA, and label, all of which fail to disclose the presence of these

impurities and the safety risks they pose, and affirmatively misrepresent there are no such impurities or safety risks.  The same is true for Apretude.

122.    These false claims, statements, and records were material to the government's purchases of and payments for Cabenuva (and soon for Apretude).  In fact, had the government known of GSK's fraud with respect to Cabenuva (and Apretude), it would not and could not have purchased the product at all.

123.    To the extent the facts alleged in this Complaint have been previously disclosed to the public or the government in any fashion, Relator is an "original source" of the information as defined in Conn. Gen. Stat. § 4-282(b).

124.    Connecticut, the public, and the public treasury have been damaged by and continue to be damaged by GSK's fraudulent conduct.

**COUNT V**
**Delaware False Claims and Reporting Act**
**6 Del. C. § 1201 *et seq.***

125.    Relator realleges and incorporates by reference all the allegations set forth herein.

126.    This is a claim for treble damages and penalties under the Delaware False Claims and Reporting Act, 6 Del. C. § 1201 *et seq.*

127.    As set forth above, in violation of 6 Del. C. § 1201(a)(1), GSK knowingly presented, or caused to be presented, to Delaware, false or fraudulent claims for payment or approval when it billed the government for Cabenuva (and Apretude), a drug which is adulterated, misbranded, and based on an FDA approval secured by fraud.  It also is a product the government would never have purchased had it known GSK has taken no steps to control or assess the risk of potentially toxic and carcinogenic impurities.  Indeed, it is a drug the government could not have purchased because of its adulterated and misbranded nature.

128.    As set forth above, in violation of 6 Del. C. § 1201(a)(2), GSK also knowingly made, used, or caused to be made or used, false records and statements to obtain payment or

31

approval by the government of GSK's false or fraudulent claims. These include the Cabenuva NDA, supplemental NDA, and label, all of which fail to disclose the presence of these impurities and the safety risks they pose, and affirmatively misrepresent there are no such impurities or safety risks. The same is true for Apretude.

129.    These false claims, statements, and records were material to the government's purchases of and payments for Cabenuva (and soon for Apretude). In fact, had the government known of GSK's fraud with respect to Cabenuva (and Apretude), it would not and could not have purchased the product at all.

130.    To the extent the facts alleged in this Complaint have been previously disclosed to the public or the government in any fashion, Relator is an "original source" of the information as defined in 6 Del. C. § 1206(b).

131.    Delaware, the public, and the public treasury have been damaged by and continue to be damaged by GSK's fraudulent conduct.

**COUNT VI**
**District of Columbia False Claims Act**
**D.C. Code § 2-381.01** *et seq.*

132.    Relator realleges and incorporates by reference all the allegations set forth herein.

133.    This is a claim for treble damages and penalties under the District of Columbia False Claims Act, D.C. Code § 2-381.01 *et seq.*

134.    As set forth above, in violation of D.C. Code § 2-381.02(a)(1), GSK knowingly presented, or caused to be presented, to the District of Columbia, false or fraudulent claims for payment or approval when it billed the government for Cabenuva (and Apretude), a drug which is adulterated, misbranded, and based on an FDA approval secured by fraud. It also is a product the government would never have purchased had it known GSK has taken no steps to control or assess the risk of potentially toxic and carcinogenic impurities. Indeed, it is a drug the government could not have purchased because of its adulterated and misbranded nature.

135.    As set forth above, in violation of D.C. Code § 2-381.02(a)(2), GSK also knowingly made, used, or caused to be made or used, false records and statements to obtain payment or approval by the government of GSK's false or fraudulent claims.  These include the Cabenuva NDA, supplemental NDA, and label, all of which fail to disclose the presence of these impurities and the safety risks they pose, and affirmatively misrepresent there are no such impurities or safety risks.  The same is true for Apretude.

136.    These false claims, statements, and records were material to the government's purchases of and payments for Cabenuva (and soon for Apretude).  In fact, had the government known of GSK's fraud with respect to Cabenuva (and Apretude), it would not and could not have purchased the product at all.

137.    To the extent the facts alleged in this Complaint have been previously disclosed to the public or the government in any fashion, Relator is an "original source" of the information as defined in D.C. Code § 2-381.03(c).

138.    The District of Columbia, the public, and the public treasury have been damaged by and continue to be damaged by GSK's fraudulent conduct.

### COUNT VII
### Florida False Claims Act
### Fla. Stat. § 68.081 *et seq.*

139.    Relator realleges and incorporates by reference all the allegations set forth herein.

140.    This is a claim for treble damages and penalties under the Florida False Claims Act, Fla. Stat. § 68.081 *et seq.*

141.    As set forth above, in violation of Fla. Stat. § 68.082(2)(a), GSK knowingly presented, or caused to be presented, to Florida, false or fraudulent claims for payment or approval when it billed the government for Cabenuva (and Apretude), a drug which is adulterated, misbranded, and based on an FDA approval secured by fraud.  It also is a product the government would never have purchased had it known GSK has taken no steps to control or

assess the risk of potentially toxic and carcinogenic impurities.  Indeed, it is a drug the government could not have purchased because of its adulterated and misbranded nature.

142.    As set forth above, in violation of Fla. Stat. § 68.082(2)(b), GSK also knowingly made, used, or caused to be made or used, false records and statements to obtain payment or approval by the government of GSK's false or fraudulent claims.  These include the Cabenuva NDA, supplemental NDA, and label, all of which fail to disclose the presence of these impurities and the safety risks they pose, and affirmatively misrepresent there are no such impurities or safety risks.  The same is true for Apretude.

143.    These false claims, statements, and records were material to the government's purchases of and payments for Cabenuva (and soon for Apretude).  In fact, had the government known of GSK's fraud with respect to Cabenuva (and Apretude), it would not and could not have purchased the product at all.

144.    To the extent the facts alleged in this Complaint have been previously disclosed to the public or the government in any fashion, Relator is an "original source" of the information as defined in Fla. Stat. § 68.087(3).

145.    Florida, the public, and the public treasury have been damaged by and continue to be damaged by GSK's fraudulent conduct.

## COUNT VIII
### Georgia Taxpayer Protection Against False Claims Act
### Ga. Code Ann. § 23-3-120 *et seq.*

146.    Relator realleges and incorporates by reference all the allegations set forth herein.

147.    This is a claim for treble damages and penalties under the Georgia Taxpayer Protection Against False Claims Act, Ga. Code Ann. § 23-3-120 *et seq.*

148.    As set forth above, in violation of Ga. Code Ann. § 23-3-121(a)(1), GSK knowingly presented, or caused to be presented, to Georgia, false or fraudulent claims for payment or approval when it billed the government for Cabenuva (and Apretude), a drug which

is adulterated, misbranded, and based on an FDA approval secured by fraud.  It also is a product the government would never have purchased had it known GSK has taken no steps to control or assess the risk of potentially toxic and carcinogenic impurities.  Indeed, it is a drug the government could not have purchased because of its adulterated and misbranded nature.

149.    As set forth above, in violation of Ga. Code Ann. § 23-3-121(a)(2), GSK also knowingly made, used, or caused to be made or used, false records and statements to obtain payment or approval by the government of GSK's false or fraudulent claims.  These include the Cabenuva NDA, supplemental NDA, and label, all of which fail to disclose the presence of these impurities and the safety risks they pose, and affirmatively misrepresent there are no such impurities or safety risks.  The same is true for Apretude.

150.    These false claims, statements, and records were material to the government's purchases of and payments for Cabenuva (and soon for Apretude).  In fact, had the government known of GSK's fraud with respect to Cabenuva (and Apretude), it would not and could not have purchased the product at all.

151.    To the extent the facts alleged in this Complaint have been previously disclosed to the public or the government in any fashion, Relator is an "original source" of the information as defined in Ga. Code Ann. § 23-3-122(j)(3).

152.    Georgia, the public, and the public treasury have been damaged by and continue to be damaged by GSK's fraudulent conduct.

**COUNT IX**
**Hawaii False Claims Act**
**Haw. Rev. Stat. § 661-21 *et seq.***

153.    Relator realleges and incorporates by reference all the allegations set forth herein.

154.    This is a claim for treble damages and penalties under the Hawaii False Claims Act, Haw. Rev. Stat. § 661-21 *et seq.*

155.    As set forth above, in violation of Haw. Rev. Stat. § 661-21(a)(1), GSK knowingly presented, or caused to be presented, to Hawaii, false or fraudulent claims for payment or approval when it billed the government for Cabenuva (and Apretude), a drug which is adulterated, misbranded, and based on an FDA approval secured by fraud.  It also is a product the government would never have purchased had it known GSK has taken no steps to control or assess the risk of potentially toxic and carcinogenic impurities.  Indeed, it is a drug the government could not have purchased because of its adulterated and misbranded nature.

156.    As set forth above, in violation of Haw. Rev. Stat. § 661-21(a)(2), GSK also knowingly made, used, or caused to be made or used, false records and statements to obtain payment or approval by the government of GSK's false or fraudulent claims.  These include the Cabenuva NDA, supplemental NDA, and label, all of which fail to disclose the presence of these impurities and the safety risks they pose, and affirmatively misrepresent there are no such impurities or safety risks.  The same is true for Apretude.

157.    These false claims, statements, and records were material to the government's purchases of and payments for Cabenuva (and soon for Apretude).  In fact, had the government known of GSK's fraud with respect to Cabenuva (and Apretude), it would not and could not have purchased the product at all.

158.    To the extent the facts alleged in this Complaint have been previously disclosed to the public or the government in any fashion, Relator is an "original source" of the information as defined in Haw. Rev. Stat. § 661-31(c).

159.    Hawaii, the public, and the public treasury have been damaged by and continue to be damaged by GSK's fraudulent conduct.

## COUNT X
### Illinois False Claims Act
### 740 Ill. Comp. Stat. § 175/1 *et seq*.

160.    Relator realleges and incorporates by reference all the allegations set forth herein.

161.     This is a claim for treble damages and penalties under the Illinois False Claims Act, 740 Ill. Comp. Stat. § 175/1 *et seq.*

162.     As set forth above, in violation of 740 Ill. Comp. Stat. § 175/3(a)(1)(A), GSK knowingly presented, or caused to be presented, to Illinois, false or fraudulent claims for payment or approval when it billed the government for Cabenuva (and Apretude), a drug which is adulterated, misbranded, and based on an FDA approval secured by fraud.  It also is a product the government would never have purchased had it known GSK has taken no steps to control or assess the risk of potentially toxic and carcinogenic impurities.  Indeed, it is a drug the government could not have purchased because of its adulterated and misbranded nature.

163.     As set forth above, in violation of, 740 Ill. Comp. Stat. § 175/3(a)(1)(B), GSK also knowingly made, used, or caused to be made or used, false records and statements to obtain payment or approval by the government of GSK's false or fraudulent claims.  These include the Cabenuva NDA, supplemental NDA, and label, all of which fail to disclose the presence of these impurities and the safety risks they pose, and affirmatively misrepresent there are no such impurities or safety risks.  The same is true for Apretude.

164.     These false claims, statements, and records were material to the government's purchases of and payments for Cabenuva (and soon for Apretude).  In fact, had the government known of GSK's fraud with respect to Cabenuva (and Apretude), it would not and could not have purchased the product at all.

165.     To the extent the facts alleged in this Complaint have been previously disclosed to the public or the government in any fashion, Relator is an "original source" of the information as defined in 740 Ill. Comp. Stat. § 175/4(e).

166.     Illinois, the public, and the public treasury have been damaged by and continue to be damaged by GSK's fraudulent conduct.

## COUNT XI
## Indiana False Claims and Whistleblower Protection Act
## Ind. Code § 5-11-5.5 *et seq.*

167.    Relator realleges and incorporates by reference all the allegations set forth herein.

168.    This is a claim for treble damages and penalties under the Indiana False Claims and Whistleblower Protection Act, Ind. Code § 5-11-5.5 *et seq*.

169.    As set forth above, in violation of Ind. Code § 5-11-5.5-2(b)(1), GSK knowingly presented, or caused to be presented, to Indiana, false or fraudulent claims for payment or approval when it billed the government for Cabenuva (and Apretude), a drug which is adulterated, misbranded, and based on an FDA approval secured by fraud.  It also is a product the government would never have purchased had it known GSK has taken no steps to control or assess the risk of potentially toxic and carcinogenic impurities.  Indeed, it is a drug the government could not have purchased because of its adulterated and misbranded nature.

170.    As set forth above, in violation of, Ind. Code § 5-11-5.5-2(b)(2), GSK also knowingly made, used, or caused to be made or used, false records and statements to obtain payment or approval by the government of GSK's false or fraudulent claims.  These include the Cabenuva NDA, supplemental NDA, and label, all of which fail to disclose the presence of these impurities and the safety risks they pose, and affirmatively misrepresent there are no such impurities or safety risks.  The same is true for Apretude.

171.    These false claims, statements, and records were material to the government's purchases of and payments for Cabenuva (and soon for Apretude).  In fact, had the government known of GSK's fraud with respect to Cabenuva (and Apretude), it would not and could not have purchased the product at all.

172.    To the extent the facts alleged in this Complaint have been previously disclosed to the public or the government in any fashion, Relator is an "original source" of the information as defined in Ind. Code § 5-11-5.5-7(f).

173.    Indiana, the public, and the public treasury have been damaged by and continue to be damaged by GSK's fraudulent conduct.

## COUNT XII
### Iowa False Claims Act
### Iowa Code § 685.1 *et seq.*

174.    Relator realleges and incorporates by reference all the allegations set forth herein.

175.    This is a claim for treble damages and penalties under the Iowa False Claims Act, Iowa Code § 685.1 *et seq.*

176.    As set forth above, in violation of Iowa Code § 685.2(1)(a), GSK knowingly presented, or caused to be presented, to Iowa, false or fraudulent claims for payment or approval when it billed the government for Cabenuva (and Apretude), a drug which is adulterated, misbranded, and based on an FDA approval secured by fraud.  It also is a product the government would never have purchased had it known GSK has taken no steps to control or assess the risk of potentially toxic and carcinogenic impurities.  Indeed, it is a drug the government could not have purchased because of its adulterated and misbranded nature.

177.    As set forth above, in violation of, Iowa Code § 685.2(1)(b), GSK also knowingly made, used, or caused to be made or used, false records and statements to obtain payment or approval by the government of GSK's false or fraudulent claims.  These include the Cabenuva NDA, supplemental NDA, and label, all of which fail to disclose the presence of these impurities and the safety risks they pose, and affirmatively misrepresent there are no such impurities or safety risks.  The same is true for Apretude.

178.    These false claims, statements, and records were material to the government's purchases of and payments for Cabenuva (and soon for Apretude).  In fact, had the government known of GSK's fraud with respect to Cabenuva (and Apretude), it would not and could not have purchased the product at all.

179.    To the extent the facts alleged in this Complaint have been previously disclosed to the public or the government in any fashion, Relator is an "original source" of the information as defined in Iowa Code § 685.3(5).

180.    Iowa, the public, and the public treasury have been damaged by and continue to be damaged by GSK's fraudulent conduct.

**COUNT XIII**
**Louisiana Medical Assistance Programs Integrity Law**
**La. Rev. Stat. § 46:437.1 *et seq.***

181.    Relator realleges and incorporates by reference all the allegations set forth herein.

182.    This is a claim for treble damages and penalties under the Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. § 46:437.1 *et seq.*

183.    As set forth above, in violation of La. Rev. Stat. § 46:438.3(A), GSK knowingly presented, or caused to be presented, to Louisiana, false or fraudulent claims for payment or approval when it billed the government for Cabenuva (and Apretude), a drug which is adulterated, misbranded, and based on an FDA approval secured by fraud.  It also is a product the government would never have purchased had it known GSK has taken no steps to control or assess the risk of potentially toxic and carcinogenic impurities.  Indeed, it is a drug the government could not have purchased because of its adulterated and misbranded nature.

184.    As set forth above, in violation of, La. Rev. Stat. § 46:438.3(B), GSK also knowingly made, used, or caused to be made or used, false records and statements to obtain payment or approval by the government of GSK's false or fraudulent claims.  These include the Cabenuva NDA, supplemental NDA, and label, all of which fail to disclose the presence of these impurities and the safety risks they pose, and affirmatively misrepresent there are no such impurities or safety risks.  The same is true for Apretude.

185.    These false claims, statements, and records were material to the government's purchases of and payments for Cabenuva (and soon for Apretude).  In fact, had the government

known of GSK's fraud with respect to Cabenuva (and Apretude), it would not and could not have

purchased the product at all.

186.    To the extent the facts alleged in this Complaint have been previously disclosed to

the public or the government in any fashion, Relator is an "original source" of the information as

defined in La. Rev. Stat. § 46:439.1(D).

187.    Louisiana, the public, and the public treasury have been damaged by and continue

to be damaged by GSK's fraudulent conduct.

**COUNT XIV**
**Maryland False Health Claims Act**
**Md. Code Ann. Health-Gen. § 2-601 *et seq*.**

188.    Relator realleges and incorporates by reference all the allegations set forth herein.

189.    This is a claim for treble damages and penalties under the Maryland False Health

Claims Act, Md. Code Ann. Health-Gen. § 2-601 *et seq*.

190.    As set forth above, in violation of Md. Code Ann. Health-Gen. § 2-602(a)(1),

GSK knowingly presented, or caused to be presented, to Maryland, false or fraudulent claims for

payment or approval when it billed the government for Cabenuva (and Apretude), a drug which

is adulterated, misbranded, and based on an FDA approval secured by fraud.  It also is a product

the government would never have purchased had it known GSK has taken no steps to control or

assess the risk of potentially toxic and carcinogenic impurities.  Indeed, it is a drug the

government could not have purchased because of its adulterated and misbranded nature.

191.    As set forth above, in violation of, Md. Code Ann. Health-Gen. § 2-602(a)(2),

GSK also knowingly made, used, or caused to be made or used, false records and statements to

obtain payment or approval by the government of GSK's false or fraudulent claims.  These

include the Cabenuva NDA, supplemental NDA, and label, all of which fail to disclose the

presence of these impurities and the safety risks they pose, and affirmatively misrepresent there

are no such impurities or safety risks.  The same is true for Apretude.

41

192.    These false claims, statements, and records were material to the government's purchases of and payments for Cabenuva (and soon for Apretude).  In fact, had the government known of GSK's fraud with respect to Cabenuva (and Apretude), it would not and could not have purchased the product at all.

193.    To the extent the facts alleged in this Complaint have been previously disclosed to the public or the government in any fashion, Relator is an "original source" of the information as defined in Md. Code Ann. Health-Gen. § 2-606(d).

194.    Maryland, the public, and the public treasury have been damaged by and continue to be damaged by GSK's fraudulent conduct.

## COUNT XV
### Massachusetts False Claims Act
### Mass. Gen. Laws ch. 12, § 5A *et seq.*

195.    Relator realleges and incorporates by reference all the allegations set forth herein.

196.    This is a claim for treble damages and penalties under the Massachusetts False Claims Act, Mass. Gen. Laws ch. 12, § 5A *et seq.*

197.    As set forth above, in violation of Mass. Gen. Laws ch. 12, § 5B(a)(1), GSK knowingly presented, or caused to be presented, to Massachusetts, false or fraudulent claims for payment or approval when it billed the government for Cabenuva (and Apretude), a drug which is adulterated, misbranded, and based on an FDA approval secured by fraud.  It also is a product the government would never have purchased had it known GSK has taken no steps to control or assess the risk of potentially toxic and carcinogenic impurities.  Indeed, it is a drug the government could not have purchased because of its adulterated and misbranded nature.

198.    As set forth above, in violation of, Mass. Gen. Laws ch. 12, § 5B(a)(2), GSK also knowingly made, used, or caused to be made or used, false records and statements to obtain payment or approval by the government of GSK's false or fraudulent claims.  These include the Cabenuva NDA, supplemental NDA, and label, all of which fail to disclose the presence of these

impurities and the safety risks they pose, and affirmatively misrepresent there are no such impurities or safety risks.  The same is true for Apretude.

199.    These false claims, statements, and records were material to the government's purchases of and payments for Cabenuva (and soon for Apretude).  In fact, had the government known of GSK's fraud with respect to Cabenuva (and Apretude), it would not and could not have purchased the product at all.

200.    To the extent the facts alleged in this Complaint have been previously disclosed to the public or the government in any fashion, Relator is an "original source" of the information as defined in Mass. Gen. Laws ch. 12, § 5G.

201.    Massachusetts, the public, and the public treasury have been damaged by and continue to be damaged by GSK's fraudulent conduct.

**COUNT XVI**
**Michigan Medicaid False Claims Act**
**Mich. Comp. Laws § 400.601 *et seq.***

202.    Relator realleges and incorporates by reference all the allegations set forth herein.

203.    This is a claim for treble damages and penalties under the Michigan Medicaid False Claims Act, Mich. Comp. Laws § 400.601 *et seq.*

204.    As set forth above, in violation of Mich. Comp. Laws § 400.603(1), GSK knowingly presented, or caused to be presented, to Michigan, false or fraudulent claims for payment or approval when it billed the government for Cabenuva (and Apretude), a drug which is adulterated, misbranded, and based on an FDA approval secured by fraud.  It also is a product the government would never have purchased had it known GSK has taken no steps to control or assess the risk of potentially toxic and carcinogenic impurities.  Indeed, it is a drug the government could not have purchased because of its adulterated and misbranded nature.

205.    As set forth above, in violation of, Mich. Comp. Laws § 400.603(2), GSK also knowingly made, used, or caused to be made or used, false records and statements to obtain

payment or approval by the government of GSK's false or fraudulent claims.  These include the Cabenuva NDA, supplemental NDA, and label, all of which fail to disclose the presence of these impurities and the safety risks they pose, and affirmatively misrepresent there are no such impurities or safety risks.  The same is true for Apretude.

206.     These false claims, statements, and records were material to the government's purchases of and payments for Cabenuva (and soon for Apretude).  In fact, had the government known of GSK's fraud with respect to Cabenuva (and Apretude), it would not and could not have purchased the product at all.

207.     To the extent the facts alleged in this Complaint have been previously disclosed to the public or the government in any fashion, Relator is an "original source" of the information as defined Mich. Comp. Laws § 400.610(13).

208.     Michigan, the public, and the public treasury have been damaged by and continue to be damaged by GSK's fraudulent conduct.

## COUNT XVII
## Minnesota False Claims Act
## Minn. Stat. § 15C.01 *et seq.*

209.     Relator realleges and incorporates by reference all the allegations set forth herein.

210.     This is a claim for treble damages and penalties under the Minnesota False Claims Act, Minn. Stat. § 15C.01 *et seq*.

211.     As set forth above, in violation of Minn. Stat. § 15C.02(a)(1), GSK knowingly presented, or caused to be presented, to Minnesota, false or fraudulent claims for payment or approval when it billed the government for Cabenuva (and Apretude), a drug which is adulterated, misbranded, and based on an FDA approval secured by fraud.  It also is a product the government would never have purchased had it known GSK has taken no steps to control or assess the risk of potentially toxic and carcinogenic impurities.  Indeed, it is a drug the government could not have purchased because of its adulterated and misbranded nature.

44

212.     As set forth above, in violation of Minn. Stat. § 15C.02(a)(2), GSK also knowingly made, used, or caused to be made or used, false records and statements to obtain payment or approval by the government of GSK's false or fraudulent claims.  These include the Cabenuva NDA, supplemental NDA, and label, all of which fail to disclose the presence of these impurities and the safety risks they pose, and affirmatively misrepresent there are no such impurities or safety risks.  The same is true for Apretude.

213.     These false claims, statements, and records were material to the government's purchases of and payments for Cabenuva (and soon for Apretude).  In fact, had the government known of GSK's fraud with respect to Cabenuva (and Apretude), it would not and could not have purchased the product at all.

214.     To the extent the facts alleged in this Complaint have been previously disclosed to the public or the government in any fashion, Relator is an "original source" of the information as defined in Minn. Stat. § 15C.01 Subd. 4.

215.     Minnesota, the public, and the public treasury have been damaged by and continue to be damaged by GSK's fraudulent conduct.

## COUNT XVIII
### Montana False Claims Act
### Mont. Code Ann. § 17-8-401 *et seq.*

216.     Relator realleges and incorporates by reference all the allegations set forth herein.

217.     This is a claim for treble damages and penalties under the Montana False Claims Act, Mont. Code Ann. § 17-8-401 *et seq*.

218.     As set forth above, in violation of Mont. Code Ann. § 17-8-403(1)(a), GSK knowingly presented, or caused to be presented, to Montana, false or fraudulent claims for payment or approval when it billed the government for Cabenuva (and Apretude), a drug which is adulterated, misbranded, and based on an FDA approval secured by fraud.  It also is a product the government would never have purchased had it known GSK has taken no steps to control or

assess the risk of potentially toxic and carcinogenic impurities.  Indeed, it is a drug the government could not have purchased because of its adulterated and misbranded nature.

219.    As set forth above, in violation of Mont. Code Ann. § 17-8-403(1)(b), GSK also knowingly made, used, or caused to be made or used, false records and statements to obtain payment or approval by the government of GSK's false or fraudulent claims.  These include the Cabenuva NDA, supplemental NDA, and label, all of which fail to disclose the presence of these impurities and the safety risks they pose, and affirmatively misrepresent there are no such impurities or safety risks.  The same is true for Apretude.

220.    These false claims, statements, and records were material to the government's purchases of and payments for Cabenuva (and soon for Apretude).  In fact, had the government known of GSK's fraud with respect to Cabenuva (and Apretude), it would not and could not have purchased the product at all.

221.    To the extent the facts alleged in this Complaint have been previously disclosed to the public or the government in any fashion, Relator is an "original source" of the information as defined in Mont. Code Ann. § 17-8-403(6).

222.    Montana, the public, and the public treasury have been damaged by and continue to be damaged by GSK's fraudulent conduct.

**COUNT XIX**
**Nevada False Claims Act**
**Nev. Rev. Stat. § 357.010 *et seq.***

223.    Relator realleges and incorporates by reference all the allegations set forth herein.

224.    This is a claim for treble damages and penalties under the Nevada False Claims Act, Nev. Rev. Stat. § 357.010 *et seq*.

225.    As set forth above, in violation of Nev. Rev. Stat. § 357.040(1)(a), GSK knowingly presented, or caused to be presented, to Nevada, false or fraudulent claims for payment or approval when it billed the government for Cabenuva (and Apretude), a drug which

is adulterated, misbranded, and based on an FDA approval secured by fraud.  It also is a product the government would never have purchased had it known GSK has taken no steps to control or assess the risk of potentially toxic and carcinogenic impurities.  Indeed, it is a drug the government could not have purchased because of its adulterated and misbranded nature.

226.    As set forth above, in violation of Nev. Rev. Stat. § 357.040(1)(b), GSK also knowingly made, used, or caused to be made or used, false records and statements to obtain payment or approval by the government of GSK's false or fraudulent claims.  These include the Cabenuva NDA, supplemental NDA, and label, all of which fail to disclose the presence of these impurities and the safety risks they pose, and affirmatively misrepresent there are no such impurities or safety risks.  The same is true for Apretude.

227.    These false claims, statements, and records were material to the government's purchases of and payments for Cabenuva (and soon for Apretude).  In fact, had the government known of GSK's fraud with respect to Cabenuva (and Apretude), it would not and could not have purchased the product at all.

228.    To the extent the facts alleged in this Complaint have been previously disclosed to the public or the government in any fashion, Relator is an "original source" of the information as defined in Nev. Rev. Stat. § 357.026.

229.    Nevada, the public, and the public treasury have been damaged by and continue to be damaged by GSK's fraudulent conduct.

## COUNT XX
### New Hampshire False Claims Act
### N.H. Rev. Stat. § 167:58 *et seq.*

230.    Relator realleges and incorporates by reference all the allegations set forth herein.

231.    This is a claim for treble damages and penalties under the New Hampshire False Claims Act, N.H. Rev. Stat. § 167:58 *et seq*.

232.    As set forth above, in violation of N.H. Rev. Stat. § 167:61(I)(a), GSK knowingly presented, or caused to be presented, to New Hampshire, false or fraudulent claims for payment or approval when it billed the government for Cabenuva (and Apretude), a drug which is adulterated, misbranded, and based on an FDA approval secured by fraud.  It also is a product the government would never have purchased had it known GSK has taken no steps to control or assess the risk of potentially toxic and carcinogenic impurities.  Indeed, it is a drug the government could not have purchased because of its adulterated and misbranded nature.

233.    As set forth above, in violation of N.H. Rev. Stat. § 167:61(I)(b), GSK also knowingly made, used, or caused to be made or used, false records and statements to obtain payment or approval by the government of GSK's false or fraudulent claims.  These include the Cabenuva NDA, supplemental NDA, and label, all of which fail to disclose the presence of these impurities and the safety risks they pose, and affirmatively misrepresent there are no such impurities or safety risks.  Indeed, it is a drug the government could not have purchased because of its adulterated and misbranded nature.

234.    These false claims, statements, and records were material to the government's purchases of and payments for Cabenuva (and soon for Apretude).  In fact, had the government known of GSK's fraud with respect to Cabenuva (and Apretude), it would not and could not have purchased the product at all.

235.    To the extent the facts alleged in this Complaint have been previously disclosed to the public or the government in any fashion, Relator is an "original source" of the information as defined in N.H. Rev. Stat. § 167:61-b(V)(c).

236.    New Hampshire, the public, and the public treasury have been damaged by and continue to be damaged by GSK's fraudulent conduct.

**COUNT XXI**
**New Jersey False Claims Act**
**N.J. Stat. Ann. § 2A:32C-1 *et seq.***

237.    Relator realleges and incorporates by reference all the allegations set forth herein.

238.    This is a claim for treble damages and penalties under the New Jersey False Claims Act, N.J. Stat. Ann. § 2A:32C-1 *et seq.*

239.    As set forth above, in violation of N.J. Stat. Ann. § 2A:32C-3(a), GSK knowingly presented, or caused to be presented, to New Jersey, false or fraudulent claims for payment or approval when it billed the government for Cabenuva (and Apretude), a drug which is adulterated, misbranded, and based on an FDA approval secured by fraud.  It also is a product the government would never have purchased had it known GSK has taken no steps to control or assess the risk of potentially toxic and carcinogenic impurities.  Indeed, it is a drug the government could not have purchased because of its adulterated and misbranded nature.

240.    As set forth above, in violation of N.J. Stat. Ann. § 2A:32C-3(b), GSK also knowingly made, used, or caused to be made or used, false records and statements to obtain payment or approval by the government of GSK's false or fraudulent claims.  These include the Cabenuva NDA, supplemental NDA, and label, all of which fail to disclose the presence of these impurities and the safety risks they pose, and affirmatively misrepresent there are no such impurities or safety risks.  The same is true for Apretude.

241.    These false claims, statements, and records were material to the government's purchases of and payments for Cabenuva (and soon for Apretude).  In fact, had the government known of GSK's fraud with respect to Cabenuva (and Apretude), it would not and could not have purchased the product at all.

242.    To the extent the facts alleged in this Complaint have been previously disclosed to the public or the government in any fashion, Relator is an "original source" of the information as defined in N.J. Stat. Ann. § 2A:32C-9(c).

243.    New Jersey, the public, and the public treasury have been damaged by and continue to be damaged by GSK's fraudulent conduct.

## COUNT XXII
## New Mexico Medicaid False Claims Act
## N.M. Stat. Ann. § 27-14-1 *et seq.*

244.    Relator realleges and incorporates by reference all the allegations set forth herein.

245.    This is a claim for treble damages and penalties under the New Mexico Medicaid False Claims Act, N.M. Stat. Ann. § 27-14-1 *et seq*.

246.    As set forth above, in violation of N.M. Stat. Ann. § 27-14-4(A), GSK knowingly presented, or caused to be presented, to New Mexico, false or fraudulent claims for payment or approval when it billed the government for Cabenuva (and Apretude), a drug which is adulterated, misbranded, and based on an FDA approval secured by fraud.  It also is a product the government would never have purchased had it known GSK has taken no steps to control or assess the risk of potentially toxic and carcinogenic impurities.  Indeed, it is a drug the government could not have purchased because of its adulterated and misbranded nature.

247.    As set forth above, in violation of N.M. Stat. Ann. § 27-14-4(C), GSK also knowingly made, used, or caused to be made or used, false records and statements to obtain payment or approval by the government of GSK's false or fraudulent claims.  These include the Cabenuva NDA, supplemental NDA, and label, all of which fail to disclose the presence of these impurities and the safety risks they pose, and affirmatively misrepresent there are no such impurities or safety risks.  The same is true for Apretude.

248.    These false claims, statements, and records were material to the government's purchases of and payments for Cabenuva (and soon for Apretude).  In fact, had the government known of GSK's fraud with respect to Cabenuva (and Apretude), it would not and could not have purchased the product at all.

249.    To the extent the facts alleged in this Complaint have been previously disclosed to the public or the government in any fashion, Relator is an "original source" of the information as defined in N.M. Stat. Ann. § 27-14-10(c).

250.    New Mexico, the public, and the public treasury have been damaged by and continue to be damaged by GSK's fraudulent conduct.

## COUNT XXIII
### New Mexico Fraud Against Taxpayers Act
### N.M. Stat. Ann. § 44-9-1 *et seq.*

251.    Relator realleges and incorporates by reference all the allegations set forth herein.

252.    This is a claim for treble damages and penalties under the New Mexico Fraud Against Taxpayers Act, N.M. Stat. Ann. § 44-9-1 *et seq.*

253.    As set forth above, in violation of N.M. Stat. Ann. § 44-9-3(A)(1), GSK knowingly presented, or caused to be presented, to New Mexico, false or fraudulent claims for payment or approval when it billed the government for Cabenuva (and Apretude), a drug which is adulterated, misbranded, and based on an FDA approval secured by fraud.  It also is a product the government would never have purchased had it known GSK has taken no steps to control or assess the risk of potentially toxic and carcinogenic impurities.  Indeed, it is a drug the government could not have purchased because of its adulterated and misbranded nature.

254.    As set forth above, in violation of N.M. Stat. Ann. § 44-9-3(A)(2), GSK also knowingly made, used, or caused to be made or used, false records and statements to obtain payment or approval by the government of GSK's false or fraudulent claims.  These include the Cabenuva NDA, supplemental NDA, and label, all of which fail to disclose the presence of these impurities and the safety risks they pose, and affirmatively misrepresent there are no such impurities or safety risks.  The same is true for Apretude.

255.    These false claims, statements, and records were material to the government's purchases of and payments for Cabenuva (and soon for Apretude).  In fact, had the government known of GSK's fraud with respect to Cabenuva (and Apretude), it would not and could not have purchased the product at all.

256.    To the extent the facts alleged in this Complaint have been previously disclosed to the public or the government in any fashion, Relator is an "original source" of the information as defined in N.M. Stat. Ann. § 44-9-7(A)(2).

257.    New Mexico, the public, and the public treasury have been damaged by and continue to be damaged by GSK's fraudulent conduct.

## COUNT XXIV
### New York False Claims Act
### N.Y. State Fin. Law § 187 *et seq.*

258.    Relator realleges and incorporates by reference all the allegations set forth herein.

259.    This is a claim for treble damages and penalties under the New York False Claims Act, N.Y. State Fin. Law § 187 *et seq*.

260.    As set forth above, in violation of N.Y. State Fin. Law § 189(1)(a), GSK knowingly presented, or caused to be presented, to New York, false or fraudulent claims for payment or approval when it billed the government for Cabenuva (and Apretude), a drug which is adulterated, misbranded, and based on an FDA approval secured by fraud.  It also is a product the government would never have purchased had it known GSK has taken no steps to control or assess the risk of potentially toxic and carcinogenic impurities.  Indeed, it is a drug the government could not have purchased because of its adulterated and misbranded nature.

261.    As set forth above, in violation of N.Y. State Fin. Law § 189(1)(b), GSK also knowingly made, used, or caused to be made or used, false records and statements to obtain payment or approval by the government of GSK's false or fraudulent claims.  These include the Cabenuva NDA, supplemental NDA, and label, all of which fail to disclose the presence of these impurities and the safety risks they pose, and affirmatively misrepresent there are no such impurities or safety risks.  The same is true for Apretude.

262.    These false claims, statements, and records were material to the government's purchases of and payments for Cabenuva (and soon for Apretude).  In fact, had the government

known of GSK's fraud with respect to Cabenuva (and Apretude), it would not and could not have purchased the product at all.

263.    To the extent the facts alleged in this Complaint have been previously disclosed to the public or the government in any fashion, Relator is an "original source" of the information as defined in N.Y. State Fin. Law § 188(7).

264.    New York, the public, and the public treasury have been damaged by and continue to be damaged by GSK's fraudulent conduct.

**COUNT XXV**
**North Carolina False Claims Act**
**N.C. Gen. Stat. § 1-605 *et seq.***

265.    Relator realleges and incorporates by reference all the allegations set forth herein.

266.    This is a claim for treble damages and penalties under the North Carolina False Claims Act, N.C. Gen. Stat. § 1-605 *et seq*.

267.    As set forth above, in violation of N.C. Gen. Stat. § 1-607(a)(1), GSK knowingly presented, or caused to be presented, to North Carolina, false or fraudulent claims for payment or approval when it billed the government for Cabenuva (and Apretude), a drug which is adulterated, misbranded, and based on an FDA approval secured by fraud.  It also is a product the government would never have purchased had it known GSK has taken no steps to control or assess the risk of potentially toxic and carcinogenic impurities.  Indeed, it is a drug the government could not have purchased because of its adulterated and misbranded nature.

268.    As set forth above, in violation of N.C. Gen. Stat. § 1-607(a)(2), GSK also knowingly made, used, or caused to be made or used, false records and statements to obtain payment or approval by the government of GSK's false or fraudulent claims.  These include the Cabenuva NDA, supplemental NDA, and label, all of which fail to disclose the presence of these impurities and the safety risks they pose, and affirmatively misrepresent there are no such impurities or safety risks.  The same is true for Apretude.

53

269.    These false claims, statements, and records were material to the government's purchases of and payments for Cabenuva (and soon for Apretude).  In fact, had the government known of GSK's fraud with respect to Cabenuva (and Apretude), it would not and could not have purchased the product at all.

270.    To the extent the facts alleged in this Complaint have been previously disclosed to the public or the government in any fashion, Relator is an "original source" of the information as defined in N.C. Gen. Stat. § 1-611(f).

271.    North Carolina, the public, and the public treasury have been damaged by and continue to be damaged by GSK's fraudulent conduct.

## COUNT XXVI
## Oklahoma Medicaid False Claims Act
## Okla. Stat. tit. 63, § 5053 *et seq.*

272.    Relator realleges and incorporates by reference all the allegations set forth herein.

273.    This is a claim for treble damages and penalties under the Oklahoma Medicaid False Claims Act, Okla. Stat. tit. 63, § 5053 *et seq.*

274.    As set forth above, in violation of Okla. Stat. tit. 63, § 5053.1(B)(1), GSK knowingly presented, or caused to be presented, to Oklahoma, false or fraudulent claims for payment or approval when it billed the government for Cabenuva (and Apretude), a drug which is adulterated, misbranded, and based on an FDA approval secured by fraud.  It also is a product the government would never have purchased had it known GSK has taken no steps to control or assess the risk of potentially toxic and carcinogenic impurities.  Indeed, it is a drug the government could not have purchased because of its adulterated and misbranded nature.

275.    As set forth above, in violation of Okla. Stat. tit. 63, § 5053.1(B)(2), GSK also knowingly made, used, or caused to be made or used, false records and statements to obtain payment or approval by the government of GSK's false or fraudulent claims.  These include the Cabenuva NDA, supplemental NDA, and label, all of which fail to disclose the presence of these

impurities and the safety risks they pose, and affirmatively misrepresent there are no such impurities or safety risks.  The same is true for Apretude.

276.     These false claims, statements, and records were material to the government's purchases of and payments for Cabenuva (and soon for Apretude).  In fact, had the government known of GSK's fraud with respect to Cabenuva (and Apretude), it would not and could not have purchased the product at all.

277.     To the extent the facts alleged in this Complaint have been previously disclosed to the public or the government in any fashion, Relator is an "original source" of the information as defined in Okla. Stat. tit. 63, § 5053.5(B).

278.     Oklahoma, the public, and the public treasury have been damaged by and continue to be damaged by GSK's fraudulent conduct.

**COUNT XXVII**
**Rhode Island False Claims Act**
**R.I. Gen. Laws § 9-1.1-1 *et seq.***

279.     Relator realleges and incorporates by reference all the allegations set forth herein.

280.     This is a claim for treble damages and penalties under the Rhode Island False Claims Act, R.I. Gen. Laws § 9-1.1-1 *et seq*.

281.     As set forth above, in violation of R.I. Gen. Laws § 9-1.1-3(a)(1), GSK knowingly presented, or caused to be presented, to Rhode Island, false or fraudulent claims for payment or approval when it billed the government for Cabenuva (and Apretude), a drug which is adulterated, misbranded, and based on an FDA approval secured by fraud.  It also is a product the government would never have purchased had it known GSK has taken no steps to control or assess the risk of potentially toxic and carcinogenic impurities.  Indeed, it is a drug the government could not have purchased because of its adulterated and misbranded nature.

282.     As set forth above, in violation of R.I. Gen. Laws § 9-1.1-3(a)(2), GSK also knowingly made, used, or caused to be made or used, false records and statements to obtain

payment or approval by the government of GSK's false or fraudulent claims.  These include the Cabenuva NDA, supplemental NDA, and label, all of which fail to disclose the presence of these impurities and the safety risks they pose, and affirmatively misrepresent there are no such impurities or safety risks.  The same is true for Apretude.

283.    These false claims, statements, and records were material to the government's purchases of and payments for Cabenuva (and soon for Apretude).  In fact, had the government known of GSK's fraud with respect to Cabenuva (and Apretude), it would not and could not have purchased the product at all.

284.    To the extent the facts alleged in this Complaint have been previously disclosed to the public or the government in any fashion, Relator is an "original source" of the information as defined in R.I. Gen. Laws § 9-1.1-4(e)(4).

285.    Rhode Island, the public, and the public treasury have been damaged by and continue to be damaged by GSK's fraudulent conduct.

### COUNT XXVIII
### Tennessee Medicaid False Claims Act
### Tenn. Code Ann. § 71-5-181 *et seq.*

286.    Relator realleges and incorporates by reference all the allegations set forth herein.

287.    This is a claim for treble damages and penalties under the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 *et seq*.

288.    As set forth above, in violation of Tenn. Code Ann. § 71-5-182(a)(1)(A), GSK knowingly presented, or caused to be presented, to Tennessee, false or fraudulent claims for payment or approval when it billed the government for Cabenuva (and Apretude), a drug which is adulterated, misbranded, and based on an FDA approval secured by fraud.  It also is a product the government would never have purchased had it known GSK has taken no steps to control or assess the risk of potentially toxic and carcinogenic impurities.  Indeed, it is a drug the government could not have purchased because of its adulterated and misbranded nature.

56

289.    As set forth above, in violation of Tenn. Code Ann. § 71-5-182(a)(1)(B), GSK also knowingly made, used, or caused to be made or used, false records and statements to obtain payment or approval by the government of GSK's false or fraudulent claims.  These include the Cabenuva NDA, supplemental NDA, and label, all of which fail to disclose the presence of these impurities and the safety risks they pose, and affirmatively misrepresent there are no such impurities or safety risks.  The same is true for Apretude.

290.    These false claims, statements, and records were material to the government's purchases of and payments for Cabenuva (and soon for Apretude).  In fact, had the government known of GSK's fraud with respect to Cabenuva (and Apretude), it would not and could not have purchased the product at all.

291.    To the extent the facts alleged in this Complaint have been previously disclosed to the public or the government in any fashion, Relator is an "original source" of the information as defined in Tenn. Code Ann. § 71-5-183(e).

292.    Tennessee, the public, and the public treasury have been damaged by and continue to be damaged by GSK's fraudulent conduct.

**COUNT XXIX**
**Texas Medicaid Fraud Protection Act**
**Tex. Hum. Res. Code Ann. § 36.001 *et seq.***

293.    Relator realleges and incorporates by reference all the allegations set forth herein.

294.    This is a claim for treble damages and penalties under the Texas Medicaid Fraud Protection Act, Tex. Hum. Res. Code Ann. § 36.001 *et seq*.

295.    As set forth above, in violation of Tex. Hum. Res. Code Ann. § 36.002(1), GSK knowingly presented, or caused to be presented, to Texas, false or fraudulent claims for payment or approval when it billed the government for Cabenuva (and Apretude), a drug which is adulterated, misbranded, and based on an FDA approval secured by fraud.  It also is a product the government would never have purchased had it known GSK has taken no steps to control or

assess the risk of potentially toxic and carcinogenic impurities.  Indeed, it is a drug the government could not have purchased because of its adulterated and misbranded nature.

296.    As set forth above, in violation of Tex. Hum. Res. Code Ann. § 36.002(2), GSK also knowingly made, used, or caused to be made or used, false records and statements to obtain payment or approval by the government of GSK's false or fraudulent claims.  These include the Cabenuva NDA, supplemental NDA, and label, all of which fail to disclose the presence of these impurities and the safety risks they pose, and affirmatively misrepresent there are no such impurities or safety risks.  The same is true for Apretude.

297.    These false claims, statements, and records were material to the government's purchases of and payments for Cabenuva (and soon for Apretude).  In fact, had the government known of GSK's fraud with respect to Cabenuva (and Apretude), it would not and could not have purchased the product at all.

298.    To the extent the facts alleged in this Complaint have been previously disclosed to the public or the government in any fashion, Relator is an "original source" of the information as defined in Tex. Hum. Res. Code Ann. § 36.113(b).

299.    Texas, the public, and the public treasury have been damaged by and continue to be damaged by GSK's fraudulent conduct.

**COUNT XXX**
**Vermont False Claims Act**
**Vt. Stat. Ann. tit. 32, § 630 *et seq.***

300.    Relator realleges and incorporates by reference all the allegations set forth herein.

301.    This is a claim for treble damages and penalties under the Vermont False Claims Act, Vt. Stat. Ann. tit. 32, § 630 *et seq.*

302.    As set forth above, in violation of Vt. Stat. Ann. tit. 32, § 631(a)(1), GSK knowingly presented, or caused to be presented, to Vermont, false or fraudulent claims for payment or approval when it billed the government for Cabenuva (and Apretude), a drug which

is adulterated, misbranded, and based on an FDA approval secured by fraud.  It also is a product the government would never have purchased had it known GSK has taken no steps to control or assess the risk of potentially toxic and carcinogenic impurities.  Indeed, it is a drug the government could not have purchased because of its adulterated and misbranded nature.

303.    As set forth above, in violation of Vt. Stat. Ann. tit. 32, § 631(a)(2), GSK also knowingly made, used, or caused to be made or used, false records and statements to obtain payment or approval by the government of GSK's false or fraudulent claims.  These include the Cabenuva NDA, supplemental NDA, and label, all of which fail to disclose the presence of these impurities and the safety risks they pose, and affirmatively misrepresent there are no such impurities or safety risks.  The same is true for Apretude.

304.    These false claims, statements, and records were material to the government's purchases of and payments for Cabenuva (and soon for Apretude).  In fact, had the government known of GSK's fraud with respect to Cabenuva (and Apretude), it would not and could not have purchased the product at all.

305.    To the extent the facts alleged in this Complaint have been previously disclosed to the public or the government in any fashion, Relator is an "original source" of the information as defined in Vt. Stat. Ann. tit. 32, § 630(5).

306.    Vermont, the public, and the public treasury have been damaged by and continue to be damaged by GSK's fraudulent conduct.

### COUNT XXXI
### Virginia Fraud Against Taxpayers Act
### Va. Code Ann. § 8.01-216.1 *et seq.*

307.    Relator realleges and incorporates by reference all the allegations set forth herein.

308.    This is a claim for treble damages and penalties under the Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1 *et seq.*

309.     As set forth above, in violation of Va. Code Ann. § 8.01-216.3(A)(1), GSK knowingly presented, or caused to be presented, to Virginia, false or fraudulent claims for payment or approval when it billed the government for Cabenuva (and Apretude), a drug which is adulterated, misbranded, and based on an FDA approval secured by fraud.  It also is a product the government would never have purchased had it known GSK has taken no steps to control or assess the risk of potentially toxic and carcinogenic impurities.  Indeed, it is a drug the government could not have purchased because of its adulterated and misbranded nature.

310.     As set forth above, in violation of Va. Code Ann. § 8.01-216.3(A)(2), GSK also knowingly made, used, or caused to be made or used, false records and statements to obtain payment or approval by the government of GSK's false or fraudulent claims.  These include the Cabenuva NDA, supplemental NDA, and label, all of which fail to disclose the presence of these impurities and the safety risks they pose, and affirmatively misrepresent there are no such impurities or safety risks.  The same is true for Apretude.

311.     These false claims, statements, and records were material to the government's purchases of and payments for Cabenuva (and soon for Apretude).  In fact, had the government known of GSK's fraud with respect to Cabenuva (and Apretude), it would not and could not have purchased the product at all.

312.     To the extent the facts alleged in this Complaint have been previously disclosed to the public or the government in any fashion, Relator is an "original source" of the information as defined in Va. Code Ann. § 8.01-216.8.

313.     Virginia, the public, and the public treasury have been damaged by and continue to be damaged by GSK's fraudulent conduct.

## COUNT XXXII
### Washington State Medicaid Fraud False Claims Act
### Wash. Rev. Code § 74.66.005 *et seq.*

314.     Relator realleges and incorporates by reference all the allegations set forth herein.

315.    This is a claim for treble damages and penalties under the Washington State Medicaid Fraud False Claims Act, Wash. Rev. Code § 74.66.005 *et seq*.

316.    As set forth above, in violation of Wash. Rev. Code § 74.66.020(1)(a), GSK knowingly presented, or caused to be presented, to Washington, false or fraudulent claims for payment or approval when it billed the government for Cabenuva (and Apretude), a drug which is adulterated, misbranded, and based on an FDA approval secured by fraud.  It also is a product the government would never have purchased had it known GSK has taken no steps to control or assess the risk of potentially toxic and carcinogenic impurities.  Indeed, it is a drug the government could not have purchased because of its adulterated and misbranded nature.

317.    As set forth above, in violation of Wash. Rev. Code § 74.66.020(1)(b), GSK also knowingly made, used, or caused to be made or used, false records and statements to obtain payment or approval by the government of GSK's false or fraudulent claims.  These include the Cabenuva NDA, supplemental NDA, and label, all of which fail to disclose the presence of these impurities and the safety risks they pose, and affirmatively misrepresent there are no such impurities or safety risks.  The same is true for Apretude.

318.    These false claims, statements, and records were material to the government's purchases of and payments for Cabenuva (and soon for Apretude).  In fact, had the government known of GSK's fraud with respect to Cabenuva (and Apretude), it would not and could not have purchased the product at all.

319.    To the extent the facts alleged in this Complaint have been previously disclosed to the public or the government in any fashion, Relator is an "original source" of the information as defined in Wash. Rev. Code § 74.66.080(2).

320.    Washington, the public, and the public treasury have been damaged by and continue to be damaged by GSK's fraudulent conduct.

## COUNT XXXIII
### The Virgin Islands False Claims Act
### VI ST T. 33 § 3501 *et seq.*

321.    Relator realleges and incorporates by reference all the allegations set forth herein.

322.    This is a claim for treble damages and penalties under the Virgin Islands False Claims Act, VI ST T. 33 § 3501 *et seq*.

323.    As set forth above, in violation of VI ST T. 33 § 3503(a)(1), GSK knowingly presented, or caused to be presented, to the Virgin Islands, false or fraudulent claims for payment or approval when it billed the government for Cabenuva (and Apretude), a drug which is adulterated, misbranded, and based on an FDA approval secured by fraud.  It also is a product the government would never have purchased had it known GSK has taken no steps to control or assess the risk of potentially toxic and carcinogenic impurities.  Indeed, it is a drug the government could not have purchased because of its adulterated and misbranded nature.

324.    As set forth above, in violation of VI ST T. 33 § 3503(a)(2), GSK also knowingly made, used, or caused to be made or used, false records and statements to obtain payment or approval by the government of GSK's false or fraudulent claims.  These include the Cabenuva NDA, supplemental NDA, and label, all of which fail to disclose the presence of these impurities and the safety risks they pose, and affirmatively misrepresent there are no such impurities or safety risks.  The same is true for Apretude.

325.    These false claims, statements, and records were material to the government's purchases of and payments for Cabenuva (and soon for Apretude).  In fact, had the government known of GSK's fraud with respect to Cabenuva (and Apretude), it would not and could not have purchased the product at all.

326.    To the extent the facts alleged in this Complaint have been previously disclosed to the public or the government in any fashion, Relator is an "original source" of the information as defined in VI ST T. 33 § 3504(c)(3).

327.     The Virgin Islands, the public, and the public treasury have been damaged by and continue to be damaged by GSK's fraudulent conduct.

## COUNT XXXIV
## The Guam False Claims and Whistleblower Act
## GU ST T. 5 § 37101 *et seq.*

328.     Relator realleges and incorporates by reference all the allegations set forth herein.

329.     This is a claim for treble damages and penalties under the Guam False Claims and Whsitlbelower Act, GU ST T. 5 § 37101 *et seq*.

330.     As set forth above, in violation of GU ST T. 5 § 37102(a)(1), GSK knowingly presented, or caused to be presented, to the Virgin Islands, false or fraudulent claims for payment or approval when it billed the government for Cabenuva (and Apretude), a drug which is adulterated, misbranded, and based on an FDA approval secured by fraud.  It also is a product the government would never have purchased had it known GSK has taken no steps to control or assess the risk of potentially toxic and carcinogenic impurities.  Indeed, it is a drug the government could not have purchased because of its adulterated and misbranded nature.

331.     As set forth above, in violation of GU ST T. 5 § 37102(a)(2), GSK also knowingly made, used, or caused to be made or used, false records and statements to obtain payment or approval by the government of GSK's false or fraudulent claims.  These include the Cabenuva NDA, supplemental NDA, and label, all of which fail to disclose the presence of these impurities and the safety risks they pose, and affirmatively misrepresent there are no such impurities or safety risks.  The same is true for Apretude.

332.     These false claims, statements, and records were material to the government's purchases of and payments for Cabenuva (and soon for Apretude).  In fact, had the government known of GSK's fraud with respect to Cabenuva (and Apretude), it would not and could not have purchased the product at all.

333.    To the extent the facts alleged in this Complaint have been previously disclosed to the public or the government in any fashion, Relator is an "original source" of the information as defined in GU ST T. 5 § 37103(2)(b).

334.    Guam, the public, and the public treasury have been damaged by and continue to be damaged by GSK's fraudulent conduct.

## COUNT XXXV
### The False Claims to the Government of Puerto Rico Programs, Contracts, and Services Act 2018 Puerto Rico Laws Act 154 *et seq.*

335.    Relator realleges and incorporates by reference all the allegations set forth herein.

336.    This is a claim for treble damages and penalties under the False Claims to the Government of Puerto Rico Programs, Contracts, and Services Act, 2018 Puerto Rico Laws Act 154 *et seq*.

337.    As set forth above, in violation of Act No. 154-2018, § 3.07(a)(1), GSK knowingly presented, or caused to be presented, to the Virgin Islands, false or fraudulent claims for payment or approval when it billed the government for Cabenuva (and Apretude), a drug which is adulterated, misbranded, and based on an FDA approval secured by fraud.  It also is a product the government would never have purchased had it known GSK has taken no steps to control or assess the risk of potentially toxic and carcinogenic impurities.  Indeed, it is a drug the government could not have purchased because of its adulterated and misbranded nature.

338.    As set forth above, in violation of Act No. 154-2018, § 3.07(a)(2), GSK also knowingly made, used, or caused to be made or used, false records and statements to obtain payment or approval by the government of GSK's false or fraudulent claims.  These include the Cabenuva NDA, supplemental NDA, and label, all of which fail to disclose the presence of these impurities and the safety risks they pose, and affirmatively misrepresent there are no such impurities or safety risks.  The same is true for Apretude.

64

339.    These false claims, statements, and records were material to the government's purchases of and payments for Cabenuva (and soon for Apretude).  In fact, had the government known of GSK's fraud with respect to Cabenuva (and Apretude), it would not and could not have purchased the product at all.

340.    Puerto Rico, the public, and the public treasury have been damaged by and continue to be damaged by GSK's fraudulent conduct.

## PRAYER FOR RELIEF

Wherefore Relator requests the following relief:

A.    That GSK cease and desist from violating 31 U.S.C. § 3729 *et seq*.; Cal. Gov't Code § 12650 *et seq*.; Colo. Rev. Stat. § 25.5-4-304 *et seq*.; Conn. Gen. Stat. § 4-275 *et seq*.; 6 Del. C. § 1201 *et seq*.; D.C. Code § 2-381.01 *et seq*.; Fla. Stat. § 68.081 *et seq*.; Ga. Code Ann. § 23-3-120 *et seq*.; Haw. Rev. Stat. § 661-21 *et seq*.; 740 Ill. Comp. Stat. § 175/1 *et seq*.; Ind. Code § 5-11-5.5 *et seq*.; Iowa Code § 685.1 *et seq*.; La. Rev. Stat. § 46:437.1 *et seq*.; Md. Code Ann. Health-Gen. § 2-601 *et seq*.; Mass. Gen. Laws ch. 12, § 5A *et seq*.; Mich. Comp. Laws § 400.601 *et seq*.; Minn. Stat. § 15C.01 *et seq*.; Mont. Code Ann. § 17-8-401 *et seq*.; Nev. Rev. Stat. § 357.010 *et seq*.; N.H. Rev. Stat. § 167:58 *et seq*.; N.J. Stat. Ann. § 2A:32C-1 *et seq*.; N.M. Stat. Ann. § 27-14-1 *et seq*.; N.M. Stat. Ann. § 44-9-1 *et seq*.; N.Y. State Fin. Law § 187 *et seq*.; N.C. Gen. Stat. § 1-605 *et seq*.; Okla. Stat. tit. 63, § 5053 *et seq*.; R.I. Gen. Laws § 9-1.1-1 *et seq*.; Tenn. Code Ann. § 71-5-181 *et seq*.; Tex. Hum. Res. Code Ann. § 36.001 *et seq*.; Vt. Stat. Ann. tit. 32, § 630 *et seq*.; Va. Code Ann. § 8.01-216.1 *et seq*.; Wash. Rev. Code § 74.66.005 *et seq*.; VI ST T. 33 § 3501 *et seq*.; GU ST T. 5 § 37101 *et seq*.; 2018 Puerto Rico Laws Act 154 *et seq*.;

B.    That the Court enter judgment against GSK in an amount equal to three times the damages suffered by the United States, various States, the Virgin Islands, Guam, Puerto Rico, and the District of Columbia, due to GSK's unlawful conduct;

C.      That the Court enter judgment against GSK assessing for each violation the maximum civil penalties allowed under 31 U.S.C. § 3729 *et seq.*; Cal. Gov't Code § 12650 *et seq.*; Colo. Rev. Stat. § 25.5-4-304 *et seq.*; Conn. Gen. Stat. § 4-275 *et seq.*; 6 Del. C. § 1201 *et seq.*; D.C. Code § 2-381.01 *et seq.*; Fla. Stat. § 68.081 *et seq.*; Ga. Code Ann. § 23-3-120 *et seq.*; Haw. Rev. Stat. § 661-21 *et seq.*; 740 Ill. Comp. Stat. § 175/1 *et seq.*; Ind. Code § 5-11-5.5 *et seq.*; Iowa Code § 685.1 *et seq.*; La. Rev. Stat. § 46:437.1 *et seq.*; Md. Code Ann. Health-Gen. § 2-601 *et seq.*; Mass. Gen. Laws ch. 12, § 5A *et seq.*; Mich. Comp. Laws § 400.601 *et seq.*; Minn. Stat. § 15C.01 *et seq.*; Mont. Code Ann. § 17-8-401 *et seq.*; Nev. Rev. Stat. § 357.010 *et seq.*; N.H. Rev. Stat. § 167:58 *et seq.*; N.J. Stat. Ann. § 2A:32C-1 *et seq.*; N.M. Stat. Ann. § 27-14-1 *et seq.*; N.M. Stat. Ann. § 44-9-1 *et seq.*; N.Y. State Fin. Law § 187 *et seq.*; N.C. Gen. Stat. § 1-605 *et seq.*; Okla. Stat. tit. 63, § 5053 *et seq.*; R.I. Gen. Laws § 9-1.1-1 *et seq.*; Tenn. Code Ann. § 71-5-181 *et seq.*; Tex. Hum. Res. Code Ann. § 36.001 *et seq.*; Vt. Stat. Ann. tit. 32, § 630 *et seq.*; Va. Code Ann. § 8.01-216.1 *et seq.*; Wash. Rev. Code § 74.66.005 *et seq.*; VI ST T. 33 § 3501 *et seq.*; GU ST T. 5 § 37101 *et seq.*; 2018 Puerto Rico Laws Act 154 *et seq.*;

D.      That Relator receive the maximum share award allowed;

E.      That Relator be awarded all costs of this action, including attorneys' fees, costs, and expenses;

F.      That the Court award pre- and post-judgment interest on any damages awarded to the United States, various States, the Virgin Islands, Guam, Puerto Rico, the District of Columbia, and Relator; and

G.      That the United States, various States, the Virgin Islands, Guam, Puerto Rico, the District of Columbia, and Relator be awarded all such other relief that the Court deems just and proper.

### JURY DEMAND

Relator hereby demands a trial by jury.

Dated: February 3, 2022

**CONSTANTINE CANNON LLP**

Gordon Schnell (*pro hac vice forthcoming*)
Elizabeth Soltan (SBN: 327510)
335 Madison Ave., 9th Floor
New York, NY 10017
gschnell@constantinecannon.com
esoltan@constantinecannon.com
Tel: (212) 350-2700

Max Voldman (*pro hac vice forthcoming*)
1001 Pennsylvania Ave., N.W.
Suite 1300N
Washington, D.C. 20004
mvoldman@constantinecannon.com
Tel: (202) 204-3500

Hallie E. Noecker (*pro hac vice forthcoming*)
150 California St., 16th Floor
San Francisco, CA 94111
hnoecker@constantinecannon.com
Tel: (415) 639-4001

*Counsel for Relator*